## IN THE COURT OF APPEALS OF IOWA

No. 15-0413
Filed October 28, 2015

**SEAN PATRICK RYAN,**
        Plaintiff-Appellee,

**vs.**

**JESSICA S. WRIGHT,**
        Defendant-Appellant.

_____

        Appeal from the Iowa District Court for Cass County, Richard H. Davidson, Judge.

        Jessica Wright appeals the district court's order establishing joint legal custody, subject to Sean Ryan's liberal rights of visitation, to the parties' two minor children. **ORDER AFFIRMED; REMANDED FOR ADDITIONAL FINDINGS.**

        Earl B. Kavanaugh and Jaclyn M. Zimmerman of Harrison & Dietz-Kilen, P.L.C., Des Moines, for appellant.

        Alexander E. Wonio of Hansen, McClintock & Riley, Des Moines, for appellee.

        Considered by Vogel, P.J., and Vaitheswaran and Bower, JJ.

**VOGEL, Presiding Judge.**

Jessica Wright appeals the district court's order establishing joint legal custody, subject to Sean Ryan's liberal rights of visitation, for the parties' two minor children, J.A.W. and J.P.W. She asserts the parties entered into a legally binding and enforceable contract when orally agreeing that Ryan would act merely as a sperm donor, rather than as a birth father with parental rights. We conclude the district court properly found Wright failed to meet her burden showing a contract had been established regarding Ryan's relinquishment of any parental rights. With respect to legal custody, the record demonstrates it is in the children's best interests for the parents to be granted joint legal custody; moreover, the visitation schedule set forth by the district court is appropriate to continue the strong bond between the children and their father. We remand for the sole purpose of allowing the district court to enter an order establishing Ryan's cash medical support obligation based on the existing record. We decline Ryan's request for appellate attorney fees.

**I. Factual and Procedural Background**

The district court found the following facts, describing the history of the couple:

> Sean Ryan and Jessica Wright began dating in 1991, when both were residing in California and employed by Jessica's father's construction company. The parties' intimate relationship continued for more than 20 years ending for the last time shortly after Sean filed his petition in this case. During their on again off again relationship, Sean and Jessica lived in California, Colorado, Arizona, New Mexico, and most recently, Iowa. The relationship was a rocky one, and their frequent attempts to share a home together, usually lasted no more than six to ten months before one or the other would grow tired of the relationship and move on.

However, they would remain apart for a while only to reconnect and renew their relationship some months later. Perhaps the longest period of time apart was the two and one-half years Sean served in prison in Arizona from July, 2003 to January, 2006. It was during this period when Jessica alleges the two entered into an oral agreement for Sean to donate sperm allowing Jessica to have children.

While incarcerated, Sean completed a number of programs including receiving his GED and receiving his certification in Level I Wastewater Treatment. Jessica visited Sean throughout his two and one-half years in prison as did Sean's parents and siblings. Upon Sean's release from prison, he moved into Jessica's home and the couple once again renewed their relationship. Sean and Jessica had discussed having children at different times during their relationship and upon Sean's release from prison, Jessica again raised the issue. Sean testified that the couple attempted to conceive children naturally in early 2006 but were unsuccessful. Sean went through fertility testing and was found to be fertile. Jessica also was tested, but according to Sean they were told she would have difficulty getting pregnant naturally. Sean also described the couple's attempts at fertility treatments as unsuccessful. When fertility therapy was unsuccessful, Sean and Jessica explored artificial insemination. The artificial insemination proved successful, and the parties' daughter, J.A.W., was born [in] 2007. The parties repeated the process, and J.P.W. was born [in] 2008. Both children were born in the state of Arizona, but shortly after J.P.W.'s birth, the parties moved to Iowa to be closer to Jessica's family. Her parents purchased a farm house on 25 acres where Jessica, Sean, and their two small children lived. After moving to Iowa, Jessica suggested she wanted a third child. Sean disagreed and believed they were tempting fate and thought they should stop with one boy and one girl. The disagreement as to whether to expand the family led to frequent arguments which resulted in Jessica asking Sean to move out of the family's home in October of 2009.

As to the state and consistency of the relationship, the district court found Ryan's testimony to be more credible than that of Wright.

In 2003, Ryan pleaded guilty to charges of aggravated assault with a deadly weapon. He was sentenced to three years in prison, serving from 2003 until 2006. Ryan also testified he had substance abuse issues in the past, but these issues were resolved during his time in prison. He asserted he has been

sober since 2003, and the district court noted it appeared Ryan had "turned his life around."

Legal bills were incurred due to Ryan's criminal proceedings. Wright asserted that she paid these bills, as well as the associated criminal fines and court costs. She claimed this was consideration for Ryan providing semen so she could have children and that, though she wanted to help Ryan, they were not romantically involved. Entered into evidence was a letter from Wright to Ryan,[1] dated August 8, 2003, that stated in part:

> If I do help you I want something in return. I don't want a marriage, relationship, or anything like that. You have done a lot of damage and who knows if forgiveness will come. Anyway, I have something I want to talk to you about next time I come to see you.

Ryan asserted the payment of the legal fees was from money the two jointly owned. He further testified he did not remember the context of the letter and that, rather than the letter requesting he donate sperm, the parties decided to have children following his release from prison. The reason for the use of artificial insemination, he stated, was because Wright could not become pregnant naturally.

After the parties separated in 2009, Ryan continued to regularly visit the children and paid an agreed-upon child support of $1000 per month. On August 7, 2013, Ryan filed a petition requesting the district court establish custody, child support, and visitation with regard to the children. A contested hearing on custody and a temporary visitation schedule was held on September 23, 2013, and the district court ordered joint legal custody of the children, with temporary

---

[1] Other letters sent to Ryan were also entered into evidence. They detailed several instances of Ryan's associates engaging in threatening behavior towards Wright.

physical care granted to Wright. The court also established a visitation schedule and ordered Ryan to pay $1000 per month in temporary child support.

Wright initially refused to comply with the temporary visitation order, and Ryan filed an application for rule to show cause. Ryan also filed a motion to appoint a guardian ad litem (GAL) for the children, which Wright resisted; a GAL was appointed on February 10, 2014.[2] On April 9, 2014, Wright requested, and the court allowed, an amendment to her response. In her amended answer and counterclaim filed May 2, 2014, Wright asserted Ryan should not be granted parental rights due to an alleged oral contract the parties formed in 2003, wherein Ryan relinquished his parental rights to donated semen, in exchange for Wright paying his legal bills.

A hearing on the parties' claims was held on September 30 and October 1, 2014. At the close of the evidence, in an oral ruling, the district court found Wright did not meet her burden establishing the existence of a contract. On March 9, 2015, the court entered a decree ordering joint legal custody of the children, with physical care granted to Wright subject to Ryan's reasonable and liberal visitation. It also established a visitation schedule, memorialized its oral ruling that Wright failed to prove the parties entered into an oral contract, and— by adopting the numbers set forth in Wright's child-support-guidelines worksheet—ordered Ryan to pay $967.07 each month in child support. However, it made no mention of cash medical support. While the court noted

---

[2] At trial, the GAL testified she had no concerns regarding Ryan's interactions with the children. However, with respect to visitation, she stated she did not believe his residence was suited for anything more than standard visitation, that is, every other weekend and one night during the week, unless Ryan obtained a larger house.

Ryan had shown Wright had been in violation of the temporary visitation order, it found the contempt had been purged, and therefore, it declined to impose sanctions. Wright appeals the court's decree with regard to its ruling on the contract issue, custody, visitation, and cash medical support.

## II. Standard of Review

This case was tried in equity; therefore, our review is de novo. *See* Iowa R. App. P. 6.907. While we give weight to the findings of the district court, particularly with regard to credibility determinations, we are not bound by them. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). To the extent we are reviewing the district court's finding as to the existence of a contract, our review is for correction of errors at law. *See Gallagher, Langlas & Gallagher v. Burco*, 587 N.W.2d 615, 617 (Iowa Ct. App. 1998).

## III. Contract

Wright first asserts the district court erred in finding she did not meet her burden showing there was an oral contract in which Ryan agreed to relinquish his parental rights. Furthermore, she contends that to the extent there is a contract, it is valid and enforceable; moreover, public policy, as well as case law in other jurisdictions, favors the conclusion that this type of contract is enforceable.

With regard to the creation of a contract, our court has noted:

> The existence of an oral contract, as well as its terms and whether it was breached, are ordinarily questions for the trier of fact. To prove the existence of an oral contract, the terms must be sufficiently definite for a court to determine with certainty the duties of each party, the conditions relative to performance, and a reasonably certain basis for a remedy. Where a contract appears to exist, courts are reluctant to find it too uncertain to be enforceable. However, when the terms are not definite, courts are reluctant to impose reasonable terms on contracting parties.

*Id.* (internal citations omitted). A meeting of the minds, wherein each party agrees to definite terms of the contract, is also necessary for a legally-binding contract to form. *See Schaer v. Webster Cnty.*, 644 N.W.2d 327, 338 (Iowa 2002) (noting that "mutual assent is based on objective evidence, not on the hidden intent of the parties").

Given the facts of the case, we conclude the district court properly found Wright failed to prove the parties entered into a contract, due to the lack of a meeting of the minds. The objective evidence—specifically, the parties' agreement that they lived together, in addition to Ryan's continual involvement in the children's lives—weighs in favor of a finding that Ryan did not intend to relinquish parental rights. *See id.* We further give weight to the district court's observation that Ryan's testimony was more credible and that the two parties were in a relationship together—that is, Ryan did not intend to act as merely a sperm donor. *See Hansen*, 733 N.W.2d at 690 (noting we give weight to the credibility determinations of the district court).

Furthermore, Wright's testimony does not support the conclusion the parties agreed to definite, clear terms; specifically, the following exchange occurred:

> Q: When you discussed the issue of donating sperm and having four children, two boys, two girls . . . did you have any agreement? Was there any agreement or discussion between the two of you about how the children would be raised? A: I—we were not talking. I didn't ask him to marry me. I didn't ask him to help raise the children. I didn't ask for child support. I told him none of that. I didn't want any of that, and I told him I didn't want any of that, didn't want marriage, didn't want—didn't even know the words co-parent at the time.
> Q: And did he—did he seem like he wanted to—I mean, did he request that he be involved raising the children? A: No.

> Q: Okay. So he—from your testimony, he agreed to what you asked of him? A: Yes.

Particularly when combined with the other evidence of the case, this testimony does not establish that Ryan relinquished his parental rights when agreeing to have children with Wright. Consequently, we agree with the district court Wright did not meet her burden establishing by a preponderance of the evidence that a meeting of the minds occurred such that a contract was created. *See Schaer*, 644 N.W.2d at 338 (holding a meeting of the minds must occur before a legally-binding contract can be formed).

Due to our conclusion that a contract was not formed, we need not address the enforceability or public policy issues Wright presents to our court.

## IV. Custody

Wright also contests the district court's award of joint legal custody. She contends Ryan is a "fun uncle" rather than a parent, she has been the children's primary caretaker since birth, and she has made all decisions regarding the children's welfare without input from Ryan. Therefore, she claims the record supports the award of sole legal custody to Wright, as opposed to the district court's conclusion—and Ryan's request—that the parties should have joint legal custody.

> Regarding legal-custody determinations, our supreme court has stated:

> "Legal custody" carries with it certain rights and responsibilities, including, but not limited to, "decision making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(3), (5) (2007). When parties are awarded "joint legal custody," "both parents have legal custodial rights and responsibilities toward the child" and "neither parent has legal custodial rights superior to those of the other parent." *Id.* § 598.1(3). In deciding whether joint custody is in the

best interest of a minor child, the court must consider several factors, including "[w]hether the parents can communicate with each other regarding the child's needs" and "whether a history of domestic abuse, as defined in section 236.2, exists." *Id.* § 598.41(3).

*In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007).

The evidence in this case supports the district court's award of joint legal custody. It is in the best interests of the children to have both parents involved in their lives and making the decisions regarding their care and well-being. Furthermore, the record does not support Wright's argument that the parties cannot work together to effectively parent the children, particularly given their relationship began in 1991, and they have adequately parented the children since they were born. Moreover, the children are comfortable with each parent, and recognize Ryan as their father.[3] These facts support the court's award of joint legal custody. *See* Iowa Code § 598.41(3)(a)–(k) (2013) (governing the considerations that must be taken into account when determining whether joint legal custody should be awarded). Consequently, we affirm the court's award of joint legal custody.

**V. Visitation**

Wright further claims the visitation schedule is not in the children's best interests. She specifically takes issue with the district court's order that the children shall be in Ryan's physical custody every other week during the summer. She argues the GAL's testimony, in which she stated Ryan's residence

---

[3] Evidence showed Wrighthas instructed the children to refer to Ryan by names other than "dad." Ryan asserted the children used to call him "dad," but now call him "buddy" or "Sean," which he does not like but has stopped correcting so as not to confuse the children further about their family situation.

was not suitable as more than a weekend place to stay, supports the conclusion the children should remain with her; furthermore, the disruption in the children's schedules would be detrimental to them.

Iowa Code section 598.41(1)(a) states a court should award "liberal visitation rights where appropriate." When considering visitation rights, our primary consideration is the best interests of the children; moreover, liberal visitation is generally considered in their best interests. *In re Marriage of Stepp*, 485 N.W.2d 846, 849 (Iowa Ct. App. 1992). Unless there is a showing visitation will in some way injure a child, visitation will not be prohibited. *In re Marriage of Toedter*, 473 N.W.2d 233, 234 (Iowa Ct. App. 1991).

Upon our de novo review, we affirm the court's visitation schedule. The record supports the conclusion that this schedule is in the children's best interests. Though it is small, the father's home is sufficient to house them. Moreover, there is no evidence that Ryan's criminal history would negatively affect the children's interactions in his community, as Wright contends. There are also no concerns regarding the adequacy of Ryan's parenting skills or how he interacts with the children. Rather, as the district court noted: "It is obvious to the Court that both children have a strong bond with their father, and due to their young ages and [Ryan]'s continued commitment to nurture his children, that bond will only grow." Therefore, we do not agree with Wright's contention that the children visiting Ryan every other week in the summer is not in their best interests. Consequently, we affirm the portion of the district court's order establishing the visitation schedule.

**VI. Cash Medical Support**

Wright's final claim asserts the district court did not comply with the child support guidelines when it failed to order Ryan to pay cash medical support for the children. She asserts the guidelines establish that, due to the children not receiving health insurance through either parent, Ryan should be responsible for paying $260 each month in cash medical support. Ryan responds Wright failed to preserve error on this issue.

It is undisputed as of October 2013 the children were insured under the state-sponsored public health insurance program, Hawk-I. At the hearing, Wright testified the child support work sheets submitted to the district court did not include calculations for medical support, due to the fact the children receive coverage from Hawk-I. However, Wright's responsive pleading prayed for the court to address the health insurance premiums as well as the uncovered medical expenses. Additionally, the amended child support guideline worksheets Wright submitted on September 22, 2014, noted that $260 should be paid by Ryan as cash medical support. The district court's order did not address cash medical support but did adopt Wright's proposed guidelines regarding child support.

"The doctrine of error preservation has two components—a substantive component and a timeliness component." *State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011) (holding a one-page resistance that stated there was no legal basis for the State's actions did not properly preserve error with respect to the defendant's constitutional claims). To preserve error on appeal, the party must first state the objection in a timely manner, that is, at a time when corrective

action can be taken, in addition to the basis for the objection. *Id.* at 524. The court must then rule on the issue. *Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012). "If the court's ruling indicates that the court *considered* the issue and necessarily ruled on it, even if the court's reasoning is 'incomplete or sparse,' the issue has been preserved." *Id.* (quoting *Meier v. Senecaut*, 641 N.W.2d 532, 540 (Iowa 2002)).

Given this standard, we do not agree Wright failed to preserve error. Though her testimony is inconsistent with the exhibits presented at trial, there was extensive evidence presented regarding the children's health insurance. Moreover, while the district court did not specifically rule on the cash-medical-support issue, it nonetheless adopted Wright's proposed child support guidelines worksheets, which did include cash medical support. Combined with extensive evidence of the children's health insurance, the record demonstrates the court at least considered the issue.[4] *See id.* Consequently, we will address the merits of this claim.

Cash medical support is governed by Iowa Code section 252E.1A, which states:

> An order or judgment that provides for temporary or permanent support for a child shall include a provision for medical support for the child as provided in this section.
> The court shall order as medical support for the child a health benefit plan if available to either parent at the time the order is entered or modified. A plan is available if the plan is accessible and the cost of the plan is reasonable.

---

[4] We note the better practice would have been to bring this omission to the attention of the district court through a motion to amend or enlarge under Iowa Rule of Civil Procedure 1.904(2). Nonetheless, because the child support guidelines require an order regarding Ryan's cash medical support obligation, it is incumbent upon our court to address the issue.

. . . .

    If a health benefit plan is not available at the time of the entry of the order, the court shall order a reasonable monetary amount in lieu of a health benefit plan, which amount shall be stated in the order. For purposes of this subsection, a reasonable amount means five percent of the gross income of the parent ordered to provide the monetary amount for medical support or, if the child support guidelines established pursuant to section 598.21B specifically provide an alternative income-based numeric standard for determining the reasonable amount, a reasonable amount means the amount as determined by the standard specified by the child support guidelines.

Iowa Code § 252E.1A(1)–(3); *see also id.* § 252E.1(9) (noting that "the payment to the obligee of a monetary amount in lieu of a health benefit plan . . . is an obligation separate from any monetary amount of child support ordered to be paid"); *see also* Iowa Ct. R. 9.12.

Cash medical support is authorized under this statutory and rule scheme. Therefore, the district court should have included this finding in its order establishing child support. We therefore remand for entry of an order that establishes Ryan's obligation with regard to cash medical support based on the existing record.

**VII. Appellate Attorney Fees**

Ryan asserts he should be awarded appellate attorney fees. An award of appellate attorney fees is not a matter of right but rests within our discretion. *In re Marriage of Scheppele*, 524 N.W.2d 678, 680 (Iowa Ct. App. 1994). When determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal. *Id.*

Pursuant to the child support worksheet, Ryan has an annual gross income of $62,400, and Wright's income is $31,200. Based on these considerations, we decline to award appellate attorney fees.

**VIII. Conclusion**

For the foregoing reasons, we conclude no contract was formed in which Ryan relinquished his parental rights. Moreover, the legal-custody determination and the visitation schedule are in the best interests of the children; consequently, we affirm this portion of the district court's order. However, a finding with regard to Ryan's obligation for cash medical support should have been included in the decree, and we remand on this issue so the district court may enter an order based on the existing record.

Costs on appeal are assessed to Wright.

**ORDER AFFIRMED; REMANDED FOR ADDITIONAL FINDINGS.**