**IN THE COURT OF APPEALS OF IOWA**

No. 16-0889
Filed October 11, 2017

**Upon the Petition of**
**CHARLES WILLIAM THOMAS,**
　　　　Petitioner-Appellee/Cross-Appellant,

**And Concerning**
**TYNE WESTFALL,**
　　　　Respondent-Appellant/Cross-Appellee.
_____

Appeal from the Iowa District Court for Warren County, John D. Lloyd,

Judge.


Tyne Westfall appeals and Charles Thomas cross-appeals from the

decree establishing paternity and determining custody and child support with

respect to their child, D.A.  **AFFIRMED ON BOTH APPEALS.**


Becky S. Knutson of Davis, Brown, Koehn, Shors & Roberts, P.C., Des

Moines, for appellant.

Tara M. Elcock of Elcock Law Firm, P.L.C., Indianola, for appellee.


Heard by Danilson, C.J., and Tabor and McDonald, JJ.

**DANILSON, Chief Judge.**

Tyne Westfall appeals and Charles Thomas cross-appeals from the decree establishing paternity and determining custody and child support with respect to their child, D.A.  Westfall contends joint physical care is not in D.A.'s best interests and seeks physical care.  Westfall also challenges the district court's determination that the child will have the surname "Westfall-Thomas."  On cross-appeal Thomas asserts the district court erred in ordering Thomas to pay half of the medical costs for Westfall's pregnancy and D.A.'s birth and fifty-two percent of D.A.'s medical expenses thereafter, and in failing to give Thomas credit for support already paid to Westfall when calculating the past-due child support.  Both parties request appellate attorney fees.

We find the district court's determination the parties will have joint physical care and the care schedule imposed are in D.A.'s best interests and affirm.  We also affirm the determination D.A. will have the surname "Westfall-Thomas" because it is in D.A.'s best interests.  We conclude the district court properly ordered Thomas to pay a portion of the pregnancy and birth-related medical costs, future medical expenses, and back child support, and affirm such orders.  We find neither party is entitled to appellate attorney fees.

**I. Background Facts and Proceedings.**

Westfall is thirty-one years old and works for a bank in the client services group.  Westfall works Monday through Friday from 8:00 a.m. to 5:00 p.m.  The district court determined Westfall's gross annual income, including her bonus, to be $60,500.  Westfall has a college degree from Simpson College in economics.  After D.A. was born, Westfall moved from her home in Des Moines to Urbandale.

Westfall shares her home in Urbandale with her aunt. Westfall testified she made the decision to move to Urbandale for D.A.'s benefit due to her belief it was a safer neighborhood and better school system.

Thomas is thirty-five years old and works as a telecommunications lead technician. Thomas has a bachelor's of science in computer science and has obtained a number of professional certifications. Thomas also provides help on his parents' farm. When D.A. was born, Thomas had a job that required frequent out-of-town travel and overtime. Thomas testified he began looking for a new job so that he could be available to parent D.A. Thomas began his current job in August 2014. In his current job, Thomas works from 7:00 a.m. to 4:00 p.m. Monday through Friday and is not required to travel often. Thomas' current job provides less salary than his previous job. The court determined Thomas' gross annual income, including his farm income, to be $65,400. Thomas lives in Indianola in a home with a house mate and longtime friend, Terry King.

Prior to D.A.'s birth in May 2014, Westfall and Thomas were friends but not in a relationship and never lived together. When Westfall first learned she was pregnant, she informed Thomas it was likely, but not certain, he was the father. Thomas maintained contact with Westfall throughout her pregnancy and attended one doctor's appointment. Thomas was present for D.A.'s birth. In June 2014, Thomas was confirmed as D.A.'s father via DNA testing.

For two months following D.A.'s birth, Thomas had sporadic visitation with D.A. at Westfall's home whenever his demanding work schedule would allow. After Thomas started his new job in August 2014, he began having regular visitation every Tuesday evening for about one and a half hours. Thomas

maintains that he continuously asked Westfall for more time with D.A. but she refused his requests. Thomas was not afforded a traditional amount of visitation—one evening during the week and every other weekend—until after the parties engaged in mediation.[1]

Thomas testified he initiated this action in November 2014 because Westfall continuously rebuffed his requests for additional time with D.A. Trial on this matter was held on September 10, 11, and 15, 2015. The district court entered its findings of fact, conclusions of law and orders on September 24, 2015, and its formal decree on April 26, 2016. With respect to custody, the district court held:

> In this case, the court sees no way to maximize the child's contact with both parents without some type of shared care, in light of [Westfall]'s consistent resistance to [Thomas'] exercise of his parental rights with respect to the child. It is in the best interests of this child to have as much contact with both of his parents as is possible. There is no indication of any kind in this record of any risk to the child when he is with [Thomas] and it appears that the court needs to encourage the parents, especially [Westfall], to be supportive of the child's relationship with the other parent.

The court established the following shared-care arrangement:

> The schedule for sharing the child shall be in alternating three-day blocks, from 5 p.m. on the first day to 5 p.m. on the last day. With this schedule, each parent will have one full weekend and two partial weekends during each four-weekend period. When the child begins kindergarten, the schedule will become alternating weeks, with the change to occur after school on Friday or at 5 p.m. on non-school days.

The court also held D.A. would have the last name "Westfall-Thomas," and ordered Thomas to pay child support in the amount of $127.44 per month,

---

[1] The parties participated in mediation on January 15, 2015, and reconvened for mediation of final matters on April 16, 2015.

$5425 in past-due child support,[2] fifty-two percent of the out-of-pocket medical expenses incurred during Westfall's pregnancy and D.A.'s birth totaling $2100.76, and fifty-two percent of D.A.'s medical expenses thereafter.

Westfall appeals the court's imposition of joint physical care and the determination D.A.'s last name will be "Westfall-Thomas." Thomas cross-appeals the court's order that he pay a portion of the pregnancy, birth-related, and future medical costs and contends the court failed to give him credit for support already paid when calculating the past-due child support.

**II. Standard of Review.**

Because this is an equitable proceeding pursuant to Iowa Code section 600B.40(1) (2014), our review is de novo. Iowa R. App. P. 6.907. Additionally, "[o]ur scope of review in a surname dispute is de novo." *Braunschweig v. Fahrenkrog*, 773 N.W.2d 888, 890 (Iowa 2009). "Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses." *In re Marriage of Hynick*, 727 N.W.2d 575, 577 (Iowa 2007) (citations omitted).

**III. Physical Care.**

First, we address the issue of physical care. Westfall contends joint physical care is not in D.A.'s best interests and seeks physical care. Thomas maintains D.A.'s best interests are served by joint physical care, allowing each parent to have substantial time with D.A. In the event it is determined joint

---

[2] Thomas was required to pay $775 per month in back child support from June 1, 2014, through December 2014.

physical care is not in D.A.'s best interests, Thomas asserts he should be given physical care because he is able to support Westfall's relationship with D.A.

Pursuant to section 600B.40, we consider custody, visitation, and support matters respecting unmarried parents as we would married parents under section 598.41. *See Montgomery v. Wells*, 708 N.W.2d 704, 707 (Iowa Ct. App. 2005). "[T]he joint physical care issue must be examined in each case on the unique facts." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).

> Any consideration of joint physical care . . . must . . . be based on Iowa's traditional and statutorily required child custody standard—the best interests of the child. Physical care issues are not to be resolved based upon perceived fairness to the *spouses*, but primarily upon what is best for the *child*. The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity.

*Id.* (emphasis in original) (citations omitted). In determining whether joint physical care is in the child's best interests, factors to be considered include stability and continuity of care "expressed in terms of an approximation rule, namely, that the caregiving of parents in the post-[decree] world should be in rough proportion to that which predated the [decree]"; "the ability of [the parents] to communicate and show mutual respect"; "the degree of conflict between the parents"; and "the degree to which the parents are in general agreement about their approach to daily matters." *Id.* at 697-99.

Here, we have two parties who genuinely want the maximum amount of time parenting D.A., are employed and have appropriate residences, have familial support, and pose no identifiable safety risk to D.A. Both Westfall and Thomas have contributed to the tension in their relationship. Westfall

consistently refused Thomas' requests for more time with D.A. and unilaterally made important decisions—including where she and D.A. would live, which medical professionals D.A. would see, and where D.A. would attend daycare. Westfall explained her reluctance to allow additional visitation was due to her unfamiliarity with Thomas and his lack of experience in caring for an infant. Although Thomas consistently requested additional time with D.A., he did not make specific visitation proposals, and he did not always take initiative in attempting to be involved in the child-rearing decisions.

We acknowledge there is some discomfort and distrust between the parties due to their unfamiliarity with each other and the stress of this matter, but the record does not reveal a concerning amount of conflict. The record does reflect that the parties have generally been able to effectively communicate with respect to D.A.'s care and any necessary change in the visitation schedule. Despite Westfall's concerns about the distance, the travel between Urbandale and Indianola is not overly burdensome so as to deter from a joint-physical-care arrangement, and Thomas testified he will be capable of transporting D.A. to Urbandale during his parenting time as necessary for school and extracurricular activities. Thomas also testified he is willing to move closer to Urbandale in the future if it would be in D.A.'s best interest. We acknowledge the joint-physical-care arrangement will require the parties to make better efforts to discuss their approach to daily matters, but nothing in the record indicates the parties are incapable of doing so.

We also acknowledge Westfall has historically been the primary caregiver to D.A. For a few months, this was due to Thomas' work schedule, but after he

changed jobs it was is largely due to Westfall's refusal to allow Thomas to assume a greater parenting role in D.A.'s life. We respect Westfall's concern for the child's safety and her reluctance to permit visitation initially, but she made little effort to become acquainted with Thomas' family members who could have assisted him on visits. For these reasons we find the approximation principle has less weight in our custody evaluation in this case.

Here, both parties are willing and capable of providing D.A. exceptional care. It is in D.A.'s best interests to have the maximum time possible with each parent to allow D.A. to establish a relationship with both Westfall and Thomas. *See* Iowa Code § 598.41(1)(a) ("The court, insofar as is reasonable and in the best interest of the child, shall order the custody award . . . which will assure the child the opportunity for the maximum continuing physical and emotional contact with both parents after the parents have separated . . . and which will encourage parents to share the rights and responsibilities of raising the child . . . ."). We therefore affirm the district court's determination the parties will have joint physical care of D.A. and the corresponding care schedule fixed by the district court.

**IV. D.A.'s Surname.**

Westfall also challenges the district court's determination that D.A.'s last name will be "Westfall-Thomas." Westfall asserts the court improperly applied the best-interest test as if this was an initial name determination under sections 598.41 and 600B.40, instead of a name change under sections 674.1 and 674.6.

Westfall contends she did not unilaterally choose D.A.'s name and Thomas was involved in the process. Therefore, Westfall argues this is not an

initial name determination, but rather a name change. For this proposition, Westfall cites *Peckosh v. Wenger*, No. 11-0119, 2011 WL 4578532 (Iowa Ct. App. Oct. 5, 2011). However, in *Peckosh*, the father signed a voluntary paternity affidavit at the hospital that expressly gave permission for the child's name. 2011 WL 4578532, at *1. In this case, Thomas did not initially agree to sign a paternity affidavit because paternity had not yet been established. Thomas also testified he only contributed and agreed to the decision respecting D.A.'s first name and expressed to Westfall that he wanted D.A. to have his last name. We agree with the district court that Westfall unilaterally chose the child's last name and find the court properly analyzed the issue as an initial name determination. *See Montgomery*, 708 N.W.2d at 706 ("In this case, [the child]'s surname was given to him, following [the mother]'s unilateral supplying of a name on the birth certificate. It is therefore not an action to *change* [the child]'s surname but a challenge to the initial determination of the name [the mother] chose to record on the birth certificate.") (emphasis in original).

> When a parent unilaterally chooses a child's name, the other parent may request the court to examine the name issue—as "the mother does not have the absolute right to name the child because of custody due to birth. Consequently, [she] should gain no advantage from her unilateral act in naming [the child]." Therefore, when the court first entertains an action between the parents to determine their legal rights and relationships with each other and the child, the court may also consider the legitimacy or the child's original naming as part of its determination of the child legal status and custody.

*Id.* (alterations in original) (citations omitted). In reaching the initial name determination, "[u]ltimately, our focus is the best interests of the child." *Id.* at 708. "[F]actors to consider when gauging the best interest of the child in an initial

name dispute" include "[c]onvenience for the child to have the same name as or a different name from the custodial parent," "[i]dentification of the child as part of a family unit," "[a]ssurances by the mother that she would not change her name if she married," "[a]voiding embarrassment, inconvenience, or confusion for the custodial parent or the child," "[t]he length of time the surname has been used," "[p]arental misconduct," "[t]he degree of community respect associated with the present or changed name," and "[a] positive or adverse effect a name change may have on the bond between the child and either parent or the parents' families." *Id.*

Westfall contends she desires D.A. to have her last name because D.A. will be the only child to carry on the name. Westfall maintains she does not intend to change her last name in the event that she gets married. Westfall argues having her last name will allow D.A. to feel a part of her family.

Thomas asserts the hyphenated last name could cause D.A. embarrassment in the future due to its implication of his parent's unmarried status. However, we have acknowledged in recent years "more courts have recognized the benefits of using a hyphenated surname for a child whose parents live separately." *In re Uker*, No. 10-1829, 2011 WL 2420702, at *3 (Iowa Ct. App. June 15, 2011).

We agree with the district court that hyphenating D.A.'s last name is in D.A.'s best interests. Neither parent has engaged in misconduct that would affect the surname determination. With the joint-physical-care arrangement, having both parents' last names will allow D.A. to feel connected with both parents. D.A. was only one year of age at the time of trial and had not had the

"Westfall" surname for a significantly long time. We disagree the hyphenated name will necessarily bring embarrassment to D.A. in the future. Having both parents' surnames will promote the bond D.A. has with each parent and each parents' extended family. We therefore affirm the district court's determination D.A.'s surname will be "Westfall-Thomas."

**V. Claims on Cross-Appeal.**

On cross-appeal, Thomas first argues the district court erred in ordering Thomas to be responsible for the pregnancy and birth-related medical expenses and fifty-two percent of D.A.'s medical expenses thereafter.

Thomas contends the district court's order was in error because he was not able to obtain health insurance for D.A. before his birth and the expense "could have been less" if Thomas was permitted to put D.A. on his health insurance. However, Thomas does not offer any evidence to establish his health insurance would have resulted in lesser costs, and does not provide any authority supporting his argument that because he "was kept out of [D.A.]'s life as much as possible" he should not be ordered to pay medical expenses.

Section 600B.25(1) provides:

> The court may order the father to pay amounts the court deems appropriate for the past support and maintenance of the child and for the reasonable and necessary expenses incurred by or for the mother in connection with prenatal care, the birth of the child, and postnatal care of the child and the mother, and other medical support . . . .

The court was well within its discretion to order Thomas to pay a portion of the medical expenses related to Westfall's pregnancy and D.A.'s birth and D.A.'s

future medical expenses. We affirm the court's order respecting Thomas' responsibility for medical expenses.

Thomas' second claim on cross-appeal is the district court erred in ordering past-due child support without crediting Thomas for past support paid. Thomas submits he should be credited $2000 for money, diapers, formula, and other items he has provided to Westfall since D.A.'s birth. However, Thomas cites to no portion of the record factually supporting this amount was paid by Thomas in past support other than his own testimony. Without such evidence, we cannot conclude that Thomas is entitled to a credit for past support due. We therefore affirm.

## VI. Appellate Attorney Fees.

Both parties request appellate attorney fees. "An award of appellate attorney fees is within the discretion of the appellate court." *Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005). "In determining whether to award appellate attorney fees, we consider 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013) (citations omitted).

Westfall did not request appellate attorney fees until her reply brief. Generally, "[p]arties cannot assert an issue for the first time in a reply brief. When they do, this court will not consider the issue." *See Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 642 (Iowa 1996). However, here Westfall's request for fees in part addresses the need to defend the claims raised on the cross-appeal. Even if Westfall may seek attorney fees in her reply brief pertaining to her defense of the cross-appeal, we conclude no appellate attorney

fees should be awarded. Westfall was not successful in her claims on appeal and is similarly-situated to Thomas in her financial ability to pay attorney fees.

We additionally conclude Thomas is not entitled to appellate attorney fees. Because Thomas has not been entirely successful on the issues raised and has an equal or greater ability to pay his attorney fees than Westfall, we decline Thomas' request for appellate attorney fees.

**VII. Conclusion.**

We find the district court's determinations regarding joint physical care, the corresponding care schedule, and D.A.'s surname are in D.A.'s best interests and affirm. We also conclude the district court properly ordered Thomas to pay a portion of the pregnancy and birth-related medical costs, future medical expenses, and back child support, and affirm such orders. We find neither party is entitled to appellate attorney fees.

**AFFIRMED ON BOTH APPEALS.**