**IN THE COURT OF APPEALS OF IOWA**

No. 21-0952
Filed May 11, 2022

**IN RE THE MARRIAGE OF ANGELLA J. FERGUSON
AND BRUCE FERGUSON**

**Upon the Petition of
ANGELLA J. FERGUSON,**
        Petitioner-Appellant,

**And Concerning
BRUCE FERGUSON,**
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Clinton County, Henry W. Latham II,

Judge.


        Angella Ferguson appeals provisions of the decree dissolving her marriage

with Bruce Ferguson. **AFFIRMED AS MODIFIED.**


        Ryan M. Beckenbaugh of Beckenbaugh Law P.C., Davenport, for appellant.

        Lynne C. Jasper, Bettendorf, for appellee.


        Heard by Bower, C.J., and Schumacher and Ahlers, JJ.

**BOWER, Chief Judge.**

Angella Ferguson appeals the physical care, spousal support, and financial provisions of the decree dissolving her marriage with Bruce Ferguson, as well as the court's denial of her request for trial attorney fees. We affirm the physical care and financial provisions of the dissolution decree, modify the spousal support and trial attorney fee rulings, and deny Angella's request for appellate attorney fees.

## I. Background Facts and Proceedings

Angella and Bruce were married on April 30, 2005. The marriage lasted over fifteen years, and the couple have twins born in 2008, C.F. and A.F.

Prior to filing for divorce, Angella was the primary caregiver. Bruce was the primary breadwinner. Angella got the children up and ready for school, made the doctor appointments, attended the school conferences, made them meals, and helped with homework. Bruce took a more active role in after-school activities. He and A.F. attended C.F.'s football and wrestling practices, spending roughly two and a half hours twice a week at C.F.'s practices. He and the children went to out-of-town competitions two or more times a month, and Bruce took both children to the fitness center to spend time with them. Since the parties separated, Bruce has been more involved in the children's lives.

Bruce and Angella's marriage has included marital arguments and infidelity. Nonetheless, both parents are extremely involved with the children. Whatever marital issues the parties have, there have been no issues regarding the children.

The parties stipulated to the division of personal property, but left the financial asset allocation to the court, including Bruce's 401(k). The district court ordered joint legal custody and alternating-week shared physical care of the

children. The court awarded Angella half the marital portion of Bruce's 401(k). The district court ordered Bruce to pay Angella rehabilitative spousal support in the amount of $500 per month for three years. The district court denied Angella's request for trial attorney fees.

Angella appeals, requesting physical care, a larger spousal support award, a larger share of Bruce's 401(k), and trial and appellate attorney fees.

Additional facts will be discussed as necessary.

## II. Standard of Review

We review dissolution cases de novo. *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). "We give weight to the factual determinations made by the district court; however, their findings are not binding upon [us]*." In re Marriage of Mann*, 943 N.W.2d 15, 18 (Iowa 2020) (citation omitted).

## III. Analysis

**A. Custody and Care.** On appeal, neither party contests the district court's award of joint legal custody. Angella seeks to overturn the district court's shared physical care ruling, requesting physical care subject to Bruce's rights of visitation. Bruce argues shared physical care is appropriate.

We begin by noting the differences between joint legal custody and shared physical care. *See generally In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007). "Legal custody" means an award of certain rights to a parent, including "decision making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(5) (2020). When joint legal custody is awarded to the parents, "neither parent has legal custodial rights superior to those of the other parent." *Id.* § 598.1(3). Parents with

joint legal custody have equal rights and equal ability to make fundamental decisions about the child's life and wellbeing. *Hynick*, 727 N.W.2d at 579.

"'Physical care' means the right and responsibility to maintain a home for the minor child and provide for routine care of the child." Iowa Code § 598.1(7). If joint physical care is awarded, "both parents have rights and responsibilities toward the child including but not limited to shared parenting time with the child, maintaining homes for the child, [and] providing routine care for the child . . . ." *Id.* § 598.1(4).[1]

> When joint physical care is not warranted, the court must choose one parent to be the primary caretaker, awarding the other parent visitation rights. Under this arrangement, the parent with primary physical care has the responsibility to maintain a residence for the child and has the sole right to make decisions concerning the child's routine care. The noncaretaker parent is relegated to the role of hosting the child for visits on a schedule determined by the court to be in the best interest of the child.

*Hynick*, 727 N.W.2d at 579 (citations omitted).

The main concern in child custody cases is the best interests of the minor child. Iowa R. App. P. 6.904(3)(o). This determination is not based on "perceived fairness to the *spouses*, but primarily upon what is best for the *child*. The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).

Courts examine the factors laid out in Iowa Code section 598.41(3) when making physical care determinations. Section 598.41(5)(a) explains that "[i]f joint legal custody is awarded to both parents, the court may award joint physical care

---

[1] We use the terms "joint physical care" and "shared physical care" synonymously.

to both joint custodial parents upon the request of either parent." Because Angella and Bruce were awarded joint legal custody and Bruce requested shared physical care, we must consider whether shared physical care is in the children's best interests. Iowa Code § 598.41(1)(a).

The Iowa Supreme Court explored the section 598.41(3) factors in *Hansen* and summarized four factors that should carry substantial, but not exclusive, weight when analyzing child custody. 733 N.W.2d at 696–99. The court noted this framework provides flexibility to consider the unique custody issues on a case-by-case basis. *Id.* at 696. The four factors enunciated in *Hansen* include: (1) the "stability and continuity of caregiving" referred to as "approximation," meaning the historical care-giving arrangements, *id.* at 696–97, (2) "the ability of spouses to communicate and show mutual respect," *id.* at 698, (3) "the degree of conflict between parties," *id.*, and (4) "the degree to which the parties are in general agreement about their approach to daily matters," *id.* at 699.

The district court determined both parents would be suitable to physically care for the children. We agree. Thus, stability and continuity of caregiving are important factors when looking at joint physical care. *See id.* at 696. The record shows that both parents have been a constant and stable force in the children's lives. While Angella has historically been more the primary caregiver, Bruce has always been involved. Bruce participated in parent-teacher conferences and household chores such as laundry and cooking, and Bruce was the primary caregiver when Angella was out of town for trips and when he traveled with both children on weekends for wrestling tournaments. Bruce has cared for the children in the home doing chores, cooking, getting the kids ready for school, doing

homework, and other routine matters. Since the separation, Bruce has participated more with doctor appointments, dentist appointments, and communicating with teachers. It is unlikely shared physical care would significantly disrupt the children because they are accustomed to having both parents involved and readily available to them. This factor supports shared-care between the parties.

Next, we consider the parties' ability to communicate and show mutual respect. *See id.* at 698. Even though there has been an increased degree of conflict and mistrust between the parties during the dissolution proceedings, "our legislature was aware that in a divorce the parties are generally not getting along well and a custody contest magnifies the adversarial nature of the dissolution proceeding." *In re Marriage of Ertmann*, 376 N.W.2d 918, 920 (Iowa Ct. App. 1985). "To be significant enough to justify a denial of joint custody, a lack of ability to communicate must be something more than the usual acrimony that accompanies a divorce." *Id.*

Bruce and Angella have shown they can communicate and show mutual respect for one another when contacting each other about the children. They were able to coordinate and switch weekends in order to accommodate C.F.'s wrestling tournament schedule. They demonstrated communication skills during the pandemic when they traded days with the children when Angella tested positive for COVID-19. While their interactions within their relationship are not perfect, their communication in regards to the children and their well-being is generally positive.

Third, we consider the degree of conflict between the parents. *Hansen*, 733 N.W.2d at 698. There has been substantial conflict between the parties before the

dissolution related to infidelity, culminating in the dissolution filing. Since filing for dissolution and Bruce moving out of the home, this conflict has lessened. The major conflicts involved the parties' relationship rather than disagreements on child rearing. The parties can minimize this conflict by focusing on the children's well-being.

We also consider the degree to which the parties are in general agreement about their approach to daily matters. *Id.* at 699. Overall the parties agree on their approach to daily matters and child-rearing practices. There is not a large disparity in discipline between the households or in their beliefs of what is acceptable for the children to be doing day-to-day.

Disagreements arise about the amount of time C.F. spends doing extracurricular activities. Bruce accompanies C.F. and typically brings A.F. to wrestling practices and tournaments. Angella is not particularly involved with C.F.'s wrestling activities. Even though both parents have strong feelings about the time C.F. spends wrestling, their communication has improved. The parties have coordinated about the wrestling tournaments and the time spent on the activity. Bruce has also eased the concerns of what A.F. does while her brother competes. C.F. will ultimately have to be the one to determine his level of involvement in wrestling and would benefit from support from both parents in whatever activities interest him.

We believe shared physical care will best further the children's physical and mental well-being and is in their best interests.. We affirm the district court's shared physical care decision.

**B. Spousal Support.** "The district court has 'considerable latitude' in fashioning or denying an award of spousal support." *Mann*, 943 N.W.2d at 20. "The goal in awarding alimony is to do equity." *In re Marriage of Pazhoor*, 971 N.W.2d 530, 541 (Iowa 2022). Iowa Code section 598.21A provides the criteria for the court to consider when determining whether to award spousal support and the amount of the payments:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.[2]
> h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
> i. The provisions of an antenuptial agreement.
> j. Other factors the court may determine to be relevant in an individual case.

Here, the district court, "considering the asset distribution as set forth in this decree and the significant difference in incomes, determine[d] it would be appropriate to order a reasonable amount of rehabilitative alimony for a short term

---

[2] Due to changes in federal tax laws, "the economic impact of alimony on the paying spouse is greater today than it has been in the past." *Mann*, 943 N.W.2d at 21.

due to the length of the marriage." The court ordered Bruce to pay Angella rehabilitative alimony of $500 per month for three years.

There is no dispute Bruce was the primary financial support for the family during this fifteen-year marriage. Both parties have a high school education. However, in the year before their dissolution, Bruce's annual income was $127,000 while Angella's was $25,000. Considering her age, current level of education, and employment history, Angella has a greatly reduced chance of supporting herself at a reasonably comparable standard of living without further training. Angella seeks rehabilitative alimony sufficient to allow her to complete a dental hygienist program and improve her future prospects. Bruce does not suggest Angella has an earning capacity above her current salary. Given the wide disparity in their incomes, a spousal support award to Angella is appropriate.

The district court ordered rehabilitative support in an amount to cover the tuition for Angella's chosen educational program (assuming no tuition changes). The award does not account for the other costs of school or help cover any cost of living as her work hours reduce during her education. It does not permit her to maintain a similar standard of living as enjoyed during the marriage while she works to become self-sufficient. Bruce's after-tax employment and veteran's monthly income is over $6000, while Angella's is about $1700. We conclude rehabilitative spousal support in the amount of $1000 per month for five years is appropriate in this case.

**C. 401(k) Division.** Marital property is to be divided equitably, based on the circumstances of each case. *Hansen*, 733 N.W.2d at 702. "An equitable division is not necessarily an equal division." *Id.*

In its original order regarding the parties' retirement accounts, the district court awarded Angella her individual retirement account, set a calculation for her to receive a proportional benefit of Bruce's pension, and awarded her half Bruce's 401(k) account.

Among the issues in the parties' motions to amend and enlarge, Bruce sought clarification whether the 401(k) account to be split was to be reduced by the outstanding loans taken from the account to pay off marital debts. In its ruling, the court modified that section of the order "to allow a reduction of the outstanding loans before such division." On appeal, Angella urges a modification in light of the original spousal support award, asking the unreduced amount of the 401(k) be divided with seventy-five percent awarded to her and twenty-five percent to Bruce. Considering our adjustment to the spousal support award in our weighing of equities, we decline to modify the 401(k) division.

Angella further requests that the loans against the 401(k) be assigned to Bruce's portion. The parties largely agree the marital portion of Bruce's 401(k) account was just under $151,000. In 2016 and 2018, he took out loans against his 401(k) to pay off marital debt; around $28,000 is still outstanding on the loans. Because the loans were incurred to alleviate marital debt, we find the reduction of principal by the loan amount prior to division is equitable. We affirm the district court's ruling on this matter.

**D. Attorney Fees.** As to attorney fees, Angella requests part of her trial attorney fees and her appellate attorney fees based on the parties' income disparity. She does not specify a dollar amount requested for her trial attorney

fees and asks for a sum of $10,000 for the appeal. While a trial attorney fee affidavit was submitted, she did not file an appellate attorney fee affidavit.

A trial court's decision on trial attorney fees is based on the parties' respective abilities to pay and is reviewed for an abuse of discretion. *Sullins*, 715 N.W.2d at 255. In declining to award Angella trial attorney fees, the court stated,

> The issues in this case did not require such contentious litigation. It was clear to this court that Angella allowed her emotions cloud her ability to reasonably resolve the matters at issue in this case. There is no reason for this court to burden Bruce with additional attorney's fees in addition to those which he has already incurred to represent his interests in this case due to the nature of these proceedings.

The court's denial of attorney fees does not appear to be based on relevant factors of need or the parties' ability to pay, but on the court's opinion that Angella caused the disagreements between the parties. We find, based on the parties' ability to pay, that Bruce should be responsible for $10,000 towards Angella's trial attorney fees.

"Appellate attorney fees are not a matter of right, but rather rest in this court's discretion. In determining whether to award appellate attorney fees, we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013) (internal quotation marks and citation omitted). We decline to award appellate attorney fees. We assess costs equally between the parties.

**AFFIRMED AS MODIFIED.**