# IN THE SUPREME COURT OF IOWA

No. 07 / 05-2103

Filed February 16, 2007

**IN RE MARRIAGE OF HOLLY A. HYNICK AND BRADLEY L. HYNICK**

**Upon the Petition of**
**HOLLY A. HYNICK**,

    Appellee,

**And Concerning**
**BRADLEY L. HYNICK**,

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Mahaska County, Daniel P. Wilson, Judge.

Wife seeks further review of court of appeals decision modifying district court decree and awarding parties joint physical care of their minor child. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Eric Borseth of Borseth Law Office, Altoona, for appellant.

Joel D. Yates of Clements, Pothoven, Stravers & Yates, Oskaloosa, for appellee.

**TERNUS, Chief Justice.**

The issue presented in this dissolution-of-marriage case is whether the parties should be awarded joint physical care of their minor son. The district court awarded primary physical care to appellee, Holly Hynick. On appeal, the court of appeals modified the trial court decree to award joint physical care to Holly and the appellant, Bradley Hynick. Upon review of the record and the governing statutes, we are convinced joint physical care is inappropriate under the circumstances of this case. Therefore, we vacate the court of appeals decision and affirm the district court.

I. *Prior Proceedings.*

Holly Hynick filed a petition for dissolution of marriage in March 2005. She and Bradley Hynick had been married since 2001 and had one child, Garisin, born in 2003. At the time of trial in October 2005, Holly was twenty-three years old, Brad was twenty-seven years old, and Garisin was two and one-half years old. The parties agreed at trial that they should share legal custody of Garisin, so the primary issue submitted to the district court was Garisin's physical care. Brad argued that he should have primary physical care of Garisin, or alternatively, that the parties should share the child's physical care. Holly requested that physical care be placed with her. She opposed joint physical care for two reasons: (1) Brad's alleged abuse of her, and (2) the parties' inability to communicate.

Concluding there was a history of domestic abuse, the trial court rejected Brad's request for joint physical care and instead awarded primary physical care to Holly. Brad was allowed visitation of one evening a week, alternating three-day weekends and holidays, and three weeks in the summer. The district court's judgment also ordered Brad to have no contact with Holly for one year.

Brad appealed, claiming it was in Garisin's best interest that the parties be awarded joint physical care. The case was transferred to the court of appeals. A divided panel of that court modified the district court decree to provide that Brad and Holly would have joint physical care of Garisin. We granted Holly's application for further review.

We review the district court's decision de novo. *See In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). " 'Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses.' " *Id.* (quoting *In re Marriage of Witten*, 672 N.W.2d 768, 778 (Iowa 2003)).

II. *Underlying Facts.*

When the parties married in 2001, Holly had completed a year of college and Brad, who has a GED, was employed. Holly completed her degree in May 2004 and took an advertising and marketing job with a local radio station. Brad was the primary income producer while Holly was in school. Holly was Garisin's primary caretaker.

At trial, both parties highlighted past conditions and conduct of the other. The evidence showed Holly had counseling in high school for a possible eating disorder. She had also suffered from episodes of depression since marrying and was being treated for a major depressive disorder at the time of trial. Holly's psychiatrist testified she was in full remission, however, and had no mental health issues that would affect her ability to parent. The evidence showed that prior to marrying Holly, Brad had had several run-ins with the law, including possession of alcohol by a minor, violation of the open container law, possession of methamphetamine, and operating a motor vehicle while intoxicated. He had no criminal record after 2000, however, until charges of domestic abuse were filed by Holly after the parties separated. Notwithstanding Holly's and Brad's problems and

shortcomings, the trial court found, and we agree, that both were good parents to Garisin.

We turn now to the allegations of domestic abuse. Holly decided to leave Brad in February 2005; Brad did not want the marriage to end. The parties agreed to share physical care of their son by each parent living in the marital home with Garisin on an alternating schedule. When Holly was not in the parties' residence, she initially lived with Deb Patterson, a person unknown to Brad. Patterson was the mother of Jason Hewitt, a friend of Holly. Brad suspected that Holly was having an affair with Hewitt, an allegation that Holly denied then and continued to deny at trial.

On February 26, 2005, Holly came to the parties' house to see Garisin. Brad began questioning Holly about where she had been and with whom she had been. Rather than answering Brad's questions, Holly decided to leave. The parties' explanations of what happened as Holly tried to walk out vary, but it is clear Holly wanted to leave and Brad wanted her to stay and talk. As Holly attempted to go out the door, Brad put his foot in the doorway to stop her, and Holly ended up with a bruise on her knee where her leg was hit by the door. As a result of this incident, Holly obtained a temporary no-contact order under Iowa Code chapter 236 (2005).

Rather than pursue a permanent no-contact order, Holly filed for divorce on March 7, 2001. The parties agreed to a temporary order allowing shared physical care of Garisin.

Brad did not handle the pending dissolution of his marriage well, and he was quite bothered by his suspicions that Holly was involved with another man. On March 26, he learned that Holly was with Hewitt at a third person's home. Brad went there and pounded on the door, shouting for Holly. Holly was scared and called the police. The officers who

responded spent several minutes talking with Brad before convincing him to leave.

On June 5, Brad called Holly to talk to her about the divorce. After speaking with him at length, Holly eventually hung up. Brad then came to her apartment and started pounding on the door. Holly told him to leave and threatened to call the police, but he kept knocking on the door. Holly finally called law enforcement, but Brad left before the officers arrived. While the officers were at Holly's apartment, Brad called her. She gave the phone to an officer who told Brad to leave Holly alone. Nonetheless, later that day, Brad called Holly again, trying to talk her out of the divorce. Holly considered Brad's phone calls not only harassing, but also threatening, as he asserted in his calls that he was not going to let her go through with the divorce.

In this same time frame, another incident occurred that eventually led Holly to seek a second no-contact order. Holly was at the home of Brad's parents to pick up Garisin when Brad arrived. While inside the house, Brad pulled down Holly's slacks and demanded to know when she stopped wearing underwear. He then went outside to Holly's vehicle and began looking through it. As she was trying to leave, Brad said something to the effect that, if he gave Holly a gun, would she just shoot him, that that would make the whole situation easier.

On June 7, 2005, Holly filed a petition for relief from domestic abuse. The district court entered a no-contact order and granted temporary custody of Garisin to Holly. The parties agreed to a visitation schedule, pending a hearing on a permanent order.

While the temporary no-contact order was in place, Brad and Holly again crossed paths. On September 22, 2005, Holly stopped at Brad's parents' home to drop off Garisin. Typically, Brad would arrive ten or

fifteen minutes after Holly left, but on that occasion he arrived while Holly was still there. As Holly got into her car to leave, Brad directed several derogatory remarks toward her in Garisin's presence.

Brad was not the only person unhappy with Holly's decision to seek a divorce. Holly's family and the couple's friends disapproved of her actions and sided with Brad at trial. They testified that Holly was manipulative, that Brad was more focused on his son than was Holly, and that Brad should have equal time with his son. They believed Holly had fabricated or at least exaggerated her claims of domestic abuse and harassment. Brad's father and mother testified similarly. Friends described instances prior to the parties' separation when Holly would criticize Brad in front of Garisin. Nonetheless, no one testified that Holly was a bad parent, and several family members acknowledged Holly was a good mother to Garisin.

III. *Applicable Law.*

In evaluating the propriety of shared physical care, it is helpful to consider this concept in the context of related principles and alternatives. When a district court dissolves a marriage involving a minor child, the court must determine who is to have legal custody of the child and who is to have physical care of the child. "Legal custody" carries with it certain rights and responsibilities, including, but not limited to, "decision making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(3), (5). When parties are awarded "joint legal custody," "both parents have legal custodial rights and responsibilities toward the child" and "neither parent has legal custodial rights superior to those of the other parent." *Id.* § 598.1(3). In deciding whether joint custody is in the best interest of a minor child, the court must consider several factors, including "[w]hether the parents can communicate with each other regarding the child's needs" and "whether a history of

domestic abuse, as defined in section 236.2, exists." *Id.* § 598.41(3). In fact, "if the court finds that a history of domestic abuse exists, a rebuttable presumption against the awarding of joint custody exists." *Id.* § 598.41(1)(*b*). When parents agree to joint custody, the court need not consider the factors set forth in section 598.41(3). *Id.* § 598.41(4).

"If joint legal custody is awarded to both parents, the court may award joint physical care to both joint custodial parents upon the request of either parent." *Id.* § 598.41(5)(*a*). " 'Physical care' means the right and responsibility to maintain a home for the minor child and provide for the routine care of the child." *Id.* § 598.1(7). Similarly to joint custody, "joint physical care" means both parents are awarded physical care of the child. *Id.* § 598.1(4). Under this arrangement, "both parents have rights and responsibilities toward the child, including, but not limited to, shared parenting time with the child, maintaining homes for the child, [and] providing routine care for the child." *Id.* "[N]either parent has physical care rights superior to those of the other parent" when joint physical care is awarded. *Id.*

Joint physical care anticipates that parents will have equal, or roughly equal, residential time with the child. *See generally* Iowa Ct. R. 9.14 (setting forth rules for determining child support obligations "[i]n cases of court-ordered joint (equally shared) physical care"). Given the fact that neither parent has rights superior to the other with respect to the child's routine care, joint physical care also envisions shared decision making on all routine matters. Obviously, such decision making requires good communication between the parents as well as mutual respect. Because domestic abuse reflects the ability of the parties to listen to one another and respect one another's opinions and feelings, the existence of domestic abuse is a significant factor in determining whether joint physical care is

appropriate. *See generally In re Marriage of Daniels*, 568 N.W.2d 51, 55 (Iowa Ct. App. 1997) (stating "evidence of untreated domestic battering should be given considerable weight in determining the primary caretaker").

When joint physical care is not warranted, the court must choose one parent to be the primary caretaker, awarding the other parent visitation rights. *See generally* Iowa Code § 598.41(1)(*a*), (5). Under this arrangement, the parent with primary physical care has the responsibility to maintain a residence for the child and has the sole right to make decisions concerning the child's routine care. *See generally id.* § 598.1(7). The noncaretaker parent is relegated to the role of hosting the child for visits on a schedule determined by the court to be in the best interest of the child. Visitation time varies widely and can even approach an amount almost equal to the time spent with the caretaker parent. *See generally* Iowa Ct. R. 9.9 (setting forth graduated credits against child support obligation for extraordinary visitation including a twenty-five percent credit for "167 or more [visitation days] but less than equally shared physical care"). Thus, the main distinction between joint physical care and primary physical care with liberal visitation rights is the joint decision making on routine matters required when parents share physical care.

IV. *Discussion.*

As mentioned above, only physical care was contested in the present case because Holly and Brad agreed they would share custody. The critical question in deciding whether joint physical care is also appropriate is whether the parties can communicate effectively on the myriad of issues that arise daily in the routine care of a child. We are convinced the record shows they cannot.

Despite the fact Brad is a good father to Garisin, Brad has not brought the same level of maturity to his relationship with Holly. Divorce is

never easy, so it is admirable that, when the parties first separated, they agreed to share physical care of Garisin. Unfortunately, Brad's personal disagreements with Holly's decisions soon led him to behave in a way that not only alienated Holly, but ultimately caused her to fear for her safety. Notwithstanding his denials and family members' minimization of his conduct, the trial court found, and we agree, that his actions were harassing and constituted domestic abuse. *See generally* Iowa Code § 236.2 (defining "domestic abuse"). While his desperate efforts to learn why his wife had left him are understandable, we cannot ignore the fact that eventually his actions reflected not the attempts of a husband trying to save his marriage, but the bitterness of a man who had been rejected and who resented his former partner. Just three weeks before trial Brad encountered Holly and rather than behave in a mature manner, he called her derogatory names in front of Garisin. In addition, Brad has not cooperated with Holly on relatively minor matters. Prior to trial, the parties reached an agreement with respect to a division of their personal property. Pursuant to their agreement, Holly was to have a photo album that contained pictures of Garisin. When Brad finally gave her the photo album, he had removed all the pictures. Moreover, he refused to give Holly any pictures of their son until a few weeks before trial.

We cannot assume in the face of such hostile and petty conduct that, if Brad were given joint physical care of Garisin, he would respect Holly's judgment and reach mutually agreeable decisions concerning their son. In spite of Brad's testimony that he would effectively communicate with Holly if they shared Garisin's physical care, we think the evidence shows Brad is simply not emotionally ready to interact with Holly in a responsible manner on a daily basis. Therefore, joint physical care is not feasible.

That brings us to the choice of which parent should be granted primary physical care. As noted earlier, we give weight to the trial court's factual findings, particularly with respect to the credibility of witnesses. The trial court had the opportunity to observe the witnesses and concluded primary care should be awarded to Holly. We agree. Even the witnesses who supported Brad's request for joint physical care agreed that Holly, while not perfect, was a good mother to her son. We also think the record demonstrates that Holly recognizes the importance of Brad's involvement in Garisin's life, as well as the involvement of the parties' extended families. She was supportive of shared physical care until Brad engaged in harassing and abusive conduct. In addition, despite the fact her parents and Brad's parents have openly disapproved of her conduct, Holly has facilitated continuing contact between Garisin and his grandparents. We believe Holly will fulfill her legal responsibility as the parent with primary physical care to support Brad's relationship with Garisin. *See* Iowa Code § 598.41(5)(*b*). It would be in Garisin's best interest that Brad similarly support Holly's relationship with their son.

We have reviewed the visitation schedule set by the trial court and find no reason to modify it.

V. *Conclusion and Disposition.*

The mutual respect and the ability to communicate essential for joint physical care is lacking in this case. Accordingly, we vacate the court of appeals decision modifying the district court's decree and awarding the parties joint physical care of their son.

We agree with the trial court's assessment that Holly should be awarded primary physical care of Garisin. Therefore, we affirm the trial court's decree awarding Holly primary physical care with liberal visitation by Brad. We hope the parties, with the support of their extended families,

will put their personal disappointments and anger aside and fashion a loving and stable environment for their son.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Hecht, J., who takes no part.