# IN THE COURT OF APPEALS OF IOWA

No. 21-0695
Filed January 12, 2022

IN RE THE MARRIAGE OF ROBERT EDGERTON
AND JESSICA EDGERTON

Upon the Petition of
ROBERT EDGERTON,
        Petitioner-Appellant,

And Concerning
JESSICA EDGERTON,
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Mills County, Michael Hooper,

Judge.

        A former husband appeals a ruling modifying the joint-physical-care

provision of the stipulated decree dissolving his marriage. **AFFIRMED AND**

**REMANDED.**

        Krisanne C. Weimer of Weimer Law, P.C., Council Bluffs, for appellant.

        P. Shawn McCann of McGinn, Springer & Noethe, P.L.C., Council Bluffs,

for appellee.

        Considered by Bower, C.J., and Greer and Badding, JJ.

**BADDING, Judge.**

When Robert and Jessica Edgerton divorced in March 2019, they agreed to share physical care of their three children. Eleven months later, the district court observed that the parties could agree on "only one thing, that the shared care arrangement no longer works." Due to the complete breakdown in communication between the parties, the court granted Jessica's request to modify the stipulated dissolution decree to place the children in her physical care. While acknowledging "both parents, separate from the other, are great loving parents," the court found the evidence showed Jessica would render better care than Robert.

On appeal, Robert raises a single issue: did the district court use the wrong standard in finding Jessica would provide "better," as opposed to "superior," care for the children? We find the court applied the correct standard and considered appropriate factors in deciding which parent should have physical care. After doing the same on our de novo review of the record, we affirm the modification ruling. We remand for the district court to determine a reasonable amount of attorney fees to be awarded to Jessica.

## I. Background Facts and Proceedings

Robert and Jessica have two sons, born in 2010 and 2012, and a daughter, born in 2016. After Robert filed for divorce in the summer of 2018, the district court approved the parties' stipulation to place the children in their joint legal custody and joint physical care on an alternating week schedule, along with a broad

right-of-first-refusal provision.[1]  Because Jessica's job allowed her to work two, twelve-hour shifts each week, she was able to take significant advantage of this provision during Robert's parenting time with the children.

Within five months of the divorce, Robert filed an application for contempt, claiming Jessica had "unilaterally decide[d] to enroll the children in the Lewis Central School District after she relocated to Council Bluffs,"[2] in violation of the decree.  He alleged it was in the children's best interests to maintain the status quo, which was to keep the two school-aged children enrolled in the Glenwood Community School District as they had been during the marriage.  Although the contempt action was later dismissed based on the parties' agreement not to remove the children from their school district, the matter was not ended.

The parties continued to argue about where the children would attend school even through the modification trial.  Jessica pushed to transfer them to a school in Council Bluffs because she believed there would be more resources available to help their younger son, who was struggling both academically and behaviorally at school.  She expressed frustration that she couldn't have an "open-minded conversation" with Robert about this issue, explaining: "I just want a chance to talk to Bob about it," but "[i]t's Glenwood or nothing."  For his part, Robert believed Jessica wanted to remove the children from Glenwood not for their

---

[1] This provision stated: "If a party having physical care of the children cannot provide that physical care, they shall offer the opportunity to provide physical care to the other parent before making daycare arrangements."

[2] The district court awarded Robert the marital home in Glenwood as stipulated by the parties, requiring Jessica to move out no later than March 1, 2019.

benefit, but because he has "a good relationship with [school personnel], they tell me everything that goes on, so she doesn't like that."

Besides disputes about school-related matters, the parties repeatedly fought over the children's extracurricular activities and medical needs. They often involved their lawyers in these arguments, which sometimes resulted in the children missing out on camps and other activities. When it came to the children's medical needs, Robert was dismissive of Jessica's concerns about the children's allergies and asthma, while Jessica questioned his concerns about their youngest child's speech delay and their middle child's possible diagnosis of attention deficit hyperactivity disorder. Even the family's doctor who conducted a well-child check for their three-year-old daughter observed: "There is a lot of conflict between mother and father over just about everything regarding the kids' care."

At bottom, Robert's mistrust of Jessica runs deep. Since the dissolution, he has insisted on communicating with Jessica only by email or text message because "[t]hat way it's all logged, there's no he said/she said, I have it in a registry." He has also videotaped all of his interactions with Jessica, most of which occur while exchanging the children. When asked why he recorded their exchanges, Robert replied: "For my safety, because I don't trust her, and . . . she twists everything around." According to Jessica, the children have noticed the videotaping and asked questions about it, like, "why does Daddy do it, why does Daddy not trust you, can't you guys get along."

The parties have not been careful about shielding the children from their animosity. For starters, Robert will not let Jessica pick the children up at his house when it's her time with them. Instead, he demands that they meet at a public

location, most often the police station. When Jessica did go to his house once, he refused to let their youngest child leave with her and called the police to report her for trespassing. Another time, when they were meeting at a Pizza Hut to exchange homework their oldest child had left behind, Jessica called the police just to "help [her] with the exchange." The parties have even involved the police in exchanges at the children's school. On Valentine's Day 2020, Robert refused to let the oldest child go with Jessica after school was dismissed early because he still had an hour left according to the parenting schedule. Jessica recalled he had their child "grasped on his upper arm" and was acting "belligerent" while other parents and children watched. She testified that, at this point, Robert began recording the onlookers, saying "look, look who's all my witnesses." Three police cruisers had to intervene to diffuse the situation.

Eleven months into co-parenting, the parties agreed this level of parental conflict constituted a material and substantial change in circumstances warranting a modification of the dissolution decree. While neither wanted to continue joint physical care, both believed they should have physical care. Unable to resolve their dispute through court-ordered mediation, the parties went to trial in January 2021. Following trial, the district court expressed regret that the parties could not set aside their differences for their children, noting, "It is sad for the court to see parents who individually want what is best for their children but who refuse to work together in making those decisions." The court found both Robert and Jessica were capable and loving parents, but as co-parents, they were "both equally lacking."

Considering the hostility exhibited by both sides during trial, the court confirmed that joint physical care was no longer in the children's best interests. In turning to the more "difficult" question of which parent should be awarded physical care, the court set forth what it considered to be the applicable legal standard:

> Because the Stipulated Decree created a shared-care arrangement and the parties now agree that a material and substantial change in circumstances has occurred, the parties are on equal footing and bear the same burden as they would in an initial custody determination; thus the question is, which parent can render "better" care, rather than superior care.

Based on the relevant factors in Iowa Code section 598.41(3) (2020) and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974), the court determined that Jessica would provide better care for the children. The court accordingly modified the decree to give her physical care with liberal visitation for Robert. Robert appeals.

## II. Standard of Review

We review the modification of a dissolution decree de novo. *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016). We give weight to the district court's fact findings, especially on witness credibility, but they do not bind us. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013).

## III. Analysis

In *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002), our court held that the

> parent seeking to change the physical care from the primary custodial parent to the petitioning parent has a heavy burden and must show the ability to offer superior care. Where one parent has primary care, that parent has been found to be the better parent. That is not the situation here, where the parents shared equally the physical and primary care of [the child]. The result of the

initial paternity order was they were both found suitable to be primary care parents.

Robert contends the district court misread *Melchiori* "as supporting the premise that the parties only have to show 'better' care" rather than "superior" care. There are several problems with Robert's argument.

First, as Jessica points out, the terms "better" and "superior" are synonymous. *Better*, Merriam-Webster, https://www.merriam-webster.com/dictionary/better#synonyms (last visited Dec. 14, 2021). The important point from *Melchiori* and our cases since then is that in a joint-physical-care modification—unlike a modification where just one parent has physical care—"the parties are on equal footing and bear the same burden as the parties in an initial custody determination."[3] *Paulsen*, 2018 WL 2727803, at *2. Put differently,

> If it is determined the joint physical care arrangement needs to be modified, the physical care provider should be the parent "who can administer most effectively to the long-term best interests of the children and place them in an environment that will foster healthy physical and emotional lives."

*In re Marriage of Berns*, No. 13-0013, 2013 WL 4009678, at *2 (Iowa Ct. App. Aug. 7, 2013) (quoting *In re Marriage of Walton*, 577 N.W.2d 869, 871 (Iowa Ct. App. 1998)).

---

[3] We recognize that our cases have not always consistently stated the standard to be applied in joint-physical-care modifications. *Compare In re Marriage of Paulsen*, No. 17-1595, 2018 WL 2727803, at *2 (Iowa Ct. App. June 6, 2018) (framing the question as "which parent can render 'better' care"), *with In re Marriage of Flick*, No. 20-1535, 2021 WL 2453111, at *3 (Iowa Ct. App. June 16, 2021) (examining whether the father established he is the "superior parent"). We believe this is a distinction without a difference given the equivalence between "better" and "superior."

Second, at the start of the modification trial, counsel for both sides stipulated that there was a material and substantial change in circumstances to warrant a modification of the original decree. Based on that stipulation, the court described the dispute as follows:

> And so, in essence, I don't need to make a determination today based on what you're both telling me that there's been a change in circumstances, and because you both had shared—a shared-care arrangement, the decision that I make today comes down to which one of you I find is a better parent.

When asked if they understood the scope of the court's inquiry, both parties replied, "Yes, I do." Robert cannot now complain the court used the wrong standard in its modification ruling. *See Hackman v. Beckwith*, 64 N.W.2d 275, 281 (Iowa 1954) ("[I]t is elementary a litigant cannot complain of error which he has invited or to which he has assented.").

And third, in examining the parties' dueling modification requests, the district court did not simply focus on which parent was "better." The court instead balanced the strengths shown by both parties in light of the relevant factors before concluding "primary care with Jessica will most likely bring the children to healthy physical, mental, and social maturity and is in the children's best interest." As stated above, this was the key inquiry. *See In re Marriage of Ruckman*, No. 13-1920, 2014 WL 3748601, at *8 (Iowa Ct. App. July 30, 2014). In reaching that determination, the court reasoned that Robert was less likely to put the children's needs first due to "his dislike and/or distrust of Jessica." *See In re Marriage of Garvis*, 411 N.W.2d 703, 707 (Iowa Ct. App. 1987) ("[W]hatever discord that may exist between [the parents] must end when the well-being of their children is involved."). The court noted that Robert tended to dismiss Jessica's concerns

about the children's medical needs; he refused to let Jessica pick the children up from his home; he recorded all of their interactions; and he held a grudge against Jessica that created tension between them and the children. Indeed, this need that Robert has to record his communications with Jessica "speaks volumes about the virulence of [his] animosity and [his] lack of trust and respect" for her, which is not lost on the children. *See Harris*, 877 N.W.2d at 442.

While acknowledging that "Jessica is not without fault," the court found she was more likely to communicate the children's needs and support their relationship with Robert than if the roles were reversed. *See* Iowa Code § 598.41(3)(c), (e). She expressed a desire to be able to talk to him on the phone and in person about their children. She set up co-parenting therapy and tried to use a parenting app to improve their communication. Robert did not make the same efforts. As for their respective parenting abilities, both Robert and Jessica testified about their active involvement in the children's daily lives. But the court found Jessica more credible than Robert in deciding she was providing more of the day-to-day routine parenting since the decree was entered. We defer to these credibility findings. *See In re Marriage of Hynick*, 727 N.W.2d 575, 580 (Iowa 2007).

Robert nevertheless argues the district court's findings are unsupported by the record. He asserts "[Jessica] was both manipulating a poorly drafted right of first refusal and also simply had more opportunity to take on the more mundane parenting tasks." He claims the court's decision to award physical care to Jessica based on her ability to attend more regularly to the children's needs, in effect, "punished [him] for maintaining his employment and being unable to exercise his

right of first refusal with the same frequency as [Jessica]." While Robert blames Jessica for exercising her right of first refusal, we note that this right was part of the parties' stipulated decree. *See In re Marriage Klemmensen*, No. 14-1292, 2015 WL 2089699, at *3 (Iowa Ct. App. May 6, 2015) (recognizing the right of first refusal in custody disputes). In any event, it is not our job to resolve physical care issues based on the perceived fairness to the parents. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). We instead must do what it is in the children's best interests. *Id.*

With that in mind, we agree with the district court's conclusion that placing the children in Jessica's physical care is in their best interests because she is the parent most likely to bring them to physical, mental, and social maturity. *See id.* But we caution the parents that they have an "ongoing mutual responsibility to cooperate in the best interests of the children." *Harris*, 877 N.W.2d at 444. As we have repeated too often:

> Even though the parents are not required to be friends, they owe it to their child[ren] to maintain an attitude of civility, act decently toward one another, and communicate openly with each other. One might well question the suitability as custodian of any parent unable to meet these minimum requirements.

*In re Marriage of Bolin*, 336 N.W.2d 441, 447 (Iowa 1983).

### IV. Attorney Fees

Jessica requests an unspecified amount of attorney fees for this appeal. The decision to award appellate attorney fees rests within our discretion. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). Factors to be considered include "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.*

We find an award of appellate attorney fees to Jessica is appropriate because Robert earns almost twice as much as her, and he did not succeed on appeal. But because Jessica did not provide an affidavit of attorney fees with documentation to support her request, we remand with instructions for the district court to determine a reasonable amount for the award. *See, e.g.*, *In re Marriage of Heiar*, 954 N.W.2d 464, 473–74 (Iowa Ct. App. 2020); *In re Marriage of Pleggenkuhle*, No. 19-0030, 2020 WL 376552, at *3 (Iowa Ct. App. Jan. 23, 2020); *In re Marriage of Tribolet*, No. 18-1929, 2019 WL 4302130, at *7 (Iowa Ct. App. Sept. 11, 2019).

**AFFIRMED AND REMANDED.**