# IN THE COURT OF APPEALS OF IOWA

No. 22-0909
Filed March 8, 2023

**ALEXANDRIA MICHELLE DOLETINA,**
    Petitioner-Appellee,

**vs.**

**AUSTIN DEAN MAXFIELD,**
    Respondent-Appellant.

_____

Appeal from the Iowa District Court for Woodbury County, Kathleen A. Kilnoski, Judge.

The father appeals the district court's order granting the mother physical care over their two children, arguing the decision is unsupported by the record. **AFFIRMED.**

John S. Moeller of John S. Moeller, P.C., Sioux City, for appellant.

Jacquelyn Johnson, Sioux City, for appellee.

Considered by Vaitheswaran, P.J., and Ahlers and Buller, JJ.

**VAITHESWARAN, Presiding Judge.**

Alexandria Doletina and Austin Maxfield are the unmarried parents of two children, born in 2019 and 2020.  Doletina filed a petition for custody, visitation, and support.  Following trial, the district court granted her physical care.  On appeal, Maxfield contends the court should have ordered joint physical care.  In his view, the court's finding that Doletina was historically the children's primary caretaker was "unsupported by the record" and the "conflict between the parties and difficulties regarding the inability to support the other parent's relationship with the children" were "typical in litigation involving family law matters" and did not foreclose joint physical care.

## I.    *Physical Care/Joint Physical Care*

Iowa Code section 600B.40 (2021) governs custody and visitation of unmarried parents.  "The legal analysis . . . is the same as that which would have been utilized if the child's parents had been married and a dissolution of their marriage had resulted."  *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988).  Among the statutory considerations are "[w]hether the parents can communicate with each other regarding the child's needs"; "[w]hether both parents have actively cared for the child before and since the separation"; and [w]hether each parent can support the other parent's relationship with the child."  Iowa Code § 598.41(3)(c), (d), (e).  In deciding whether joint physical care is in a child's best interest, the district court considers four nonexclusive factors: (1) "approximation" or the history of physical caregiving between the parents; (2) the ability of the parties to communicate; (3) the degree of conflict between the parties; and (4) the degree to

which the parents are in general agreement about their approach to daily matters. *See In re Marriage of Hansen*, 733 N.W.2d 683, 697-98 (Iowa 2007).

**Primary Caretaker.** As noted by Maxfield, the district court found that Doletina was "historically . . . the children's primary care giver." The record supports the finding.

Doletina lived in Florida, where she had been raised, where she attended college, and where her parents remained. At the inception of the relationship, Maxfield was stationed at an Army base in Alabama. He attended the first child's birth in Florida and spent two weeks with Doletina and the child before returning to Alabama. He spent a total of sixteen days and nights with mother and child during the first six months of the child's life. Maxfield admitted Doletina was the primary caregiver during that period.

When the child was six and one-half to seven months old, Doletina moved to Alabama. She served as the child's primary caretaker until the child turned one. Doletina estimated Maxfield provided "[f]ifteen to [twenty] percent" of the care during that period. Although Maxfield denied Doletina was the primary caretaker, he admitted to being away from the home more than twelve hours a day five days per week and he admitted that no one other than Doletina cared for the child during that period.

Doletina returned to Florida for the second child's birth. Maxfield attended the birth and remained in Florida for two months. At that juncture, the parents moved to Iowa to be closer to Maxfield's family. Maxfield initially worked for his father's landscaping operation, then added a full-time job as a firefighter, with twenty-four hours on and forty-eight off. He continued with his landscaping work

on his "off" days. He also served in the National Guard for two weeks in the summer and one weekend per month. Doletina, who initially did not earn wages, continued in her primary caretaking role for several months. She estimated that Maxfield cared for the children "[t]wenty to [thirty]" percent of the time.

Doletina obtained full-time employment outside of the home in early 2021. The parents ended their relationship two months later.

Following the parents' separation and the filing of the petition, the district court granted Doletina temporary physical care, subject to Maxfield's right of visitation. Maxfield sought an equal division of parenting time, but his overnight work schedule effectively precluded such an arrangement.[1] To accommodate the schedule, the court granted Maxfield visitation "every other week from Monday at 8:00 a.m. until the following Monday at 8:00 a.m." The court gave Doletina the right "to care for the minor children while [Maxfield was] working during [his] parenting week." The order afforded Doletina additional caretaking time while also affording Maxfield significant parenting time short of joint physical care.[2]

The district court incorporated the same schedule in the final decree. The court found Doletina "continued to have the edge over [Maxfield] in being able to spend more time with [the children], simply because his work schedule forced him

---

[1] "While joint physical care does require equal responsibility on routine, daily decision-making, it does not require that the residential arrangements be determined with mathematical precision." *See In re Seay*, 746 N.W.2d 833, 835–36 (Iowa 2008). At the same time, residential time should be "equal, or roughly equal." *Id.* (quoting *In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007)). Here, it was not.

[2] Maxfield's visitation time was so great that the district court filed a posttrial order granting him a fifteen percent extraordinary visitation credit on his child support obligation except during periods of deployment.

to be away overnight during his firefighting work, drill weekends, and two-week summer guard duty." Doletina also was able to attend to the children during the workday, if necessary. She testified her job was "[v]ery flexible" and there were "a plethora of times" when she was "able to take the boys to [her] work" if they were sick" and "multiple times" when she left work "to take them to doctors' appointments." Her supervisor corroborated her testimony.

We agree with the district court that Doletina served as the children's primary caretaker before and after the separation. This factor, together with the impracticality of a joint physical care arrangement in light of Maxfield's work schedule, weighed in favor of granting Doletina physical care of the children.

*Communication.* The district court found the parents "struggled to communicate effectively." While the court stated "[b]oth parties share[d] some responsibility for the communication problems," the "predominant issue," in the court's view, was Maxfield's "lack of flexibility and tone of disdain toward" Doletina. The court found Maxfield did "not always give[] [Doletina] the respect that she deserve[d] as a co-equal parent." The record supports these findings.

Doletina testified it was "very hard to communicate with" Maxfield because she was "always getting cut off or talk[ed] down to." She said it was difficult to resolve issues relating to the children because "no matter what" she did, it was "not right" and she was "always having to bend or step on eggshells in order to just come to an agreement or come to a resolution on anything."

Maxfield did not disagree with this assessment. He acknowledged having called Doletina "ridiculously immature," and several of his text messages included language of that nature. While the communications were not so fraught as to by

themselves foreclose joint physical care, the combination of this factor with Doletina's historical caregiving role and Maxfield's work schedule supported the court's rejection of that option.

***Support of the Other Parent's Relationship***.  The district court found that Doletina's, "willingness to live in Iowa [said] much about her insight into the importance of [Maxfield] in the children's lives."  We agree.  As noted at the outset, Doletina moved away from her home state solely to be closer to Maxfield's family.  She took the children to visit Maxfield's grandmother and regularly talked and communicated by text message with his mother and sisters.  She also invited Maxfield and his family members to various events.  Even Maxfield characterized Doletina as "an awesome mom."  This factor weighed in favor of the district court's decision.

On our de novo review of the record, we conclude the district court acted equitably in denying Maxfield's request for joint physical care and in granting Doletina physical care of the children.  We find it unnecessary to discuss other factors bearing on the choice of a physical-care arrangement.

## II.    Attorney Fees

Maxfield argues the district court should not have ordered him to pay $2500 towards Doletina's trial attorney fee obligation.  In his view, the earnings disparity was not so great as to justify the award.  That disparity was more than $20,000 annually.  Given the difference, we conclude the district court did not abuse its discretion in requiring Maxfield to cover a portion of Doletina's trial attorney fees. *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006) (setting forth standard of review).

Doletina seeks an award of $6750 in appellate attorney fees. An award is discretionary. *See In re Marriage of Benson*, 545 N.W.2d 252, 258 (Iowa 1996). Given Doletina's obligation to defend the appeal and the earnings difference cited above, we order Maxfield to pay $3000 towards her appellate attorney fee obligation.

**AFFIRMED.**