# IN THE COURT OF APPEALS OF IOWA

No. 24-0893
Filed September 4, 2025

IN RE THE MARRIAGE OF MATTHEW ALEXANDER MAXWELL
AND KATIE ANN MAXWELL

Upon the Petition of
**MATTHEW ALEXANDER MAXWELL,**
Petitioner-Appellant/Cross-Appellee,

And Concerning
**KATIE ANN MAXWELL,**
Respondent-Appellee.

**STATE OF IOWA, DEPARTMENT OF HEALTH AND HUMAN SERVICES, CHILD SUPPORT SERVICES,**
Cross-Appellant.
_____

Appeal from the Iowa District Court for Pottawattamie County, Jennifer Benson Bahr, Judge.

A father appeals the district court's denial of his request to modify the physical care provisions of his dissolution decree, and the State appeals the district court's modification of the child support provisions of the parties' dissolution decree. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Tara Ann Wrighton of Hightower Reff Law, LLC, Omaha, Nebraska, for appellant/cross-appellee.

Brenna Bird, Attorney General, and Richard D. Arnold and Gary J. Otting, Assistant Attorneys General, for cross-appellant.

Keith M. Buzzard of McGinn, Springer & Noethe, PLC, Council Bluffs, for appellee.

Considered without oral argument by Buller, P.J., Sandy, J., and Mullins, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**SANDY, Judge.**

Matthew Maxwell appeals the district court's denial of his petition to modify the physical care provisions of the decree dissolving his marriage to Katie Maxwell. On appeal, Matthew contends the district court erred by not granting his request to modify the decree to provide for joint physical care of his and Katie's two sons.

Additionally, the Iowa Department of Human Services, Child Support Services (hereinafter the "CSS") appeals the district court's modification of the child support provisions of Matthew and Katie's dissolution decree. Because CSS was providing support services, it argues it was a party to the decree for purposes of child support and thus should have received notice and been given an opportunity to be heard on the issue of modification of child support. Because it was not given notice or an opportunity to be heard, CSS contends the district court's modification of the child support provisions of the decree is void.

After our careful review of the record, we affirm the district court's denial of Matthew's request for joint physical care. We conclude joint physical care is not in the children's best interests. However, we vacate the district court's modification of the child support provisions. Because CSS was providing support services prior to the start of the modification action, it was a party to the decree for child support purposes and should have been given notice and an opportunity to be heard. Accordingly, we remand for a hearing on the issue of modification of the child support provisions of the decree with proper notice given to all parties and an opportunity for all parties to present evidence and argue their respective positions.

## I. Background Facts and Proceedings

Matthew and Katie were married in 2017. Their relationship produced two sons—B.M., born in 2014; and W.M., born in 2018. While the parties were married, they lived together with their children in a small home in Council Bluffs. However, in March 2019, Matthew moved out of the family home to Stanton, Nebraska—located approximately 110 miles from Council Bluffs—to live with his father and stepmother. According to Matthew, he moved to Stanton "for support" following the breakdown of his marriage to Katie.

Two months later, Matthew filed a petition to dissolve the marriage. The parties entered into a stipulation, which the district court subsequently adopted and incorporated as its dissolution decree. The decree provided that the parties would have joint legal custody of the children, while Katie would have physical care. However, Matthew was granted liberal visitation, which included alternating weekends and an alternating visit every other Wednesday evening from 4:30 p.m. to 8:00 p.m. As for child support, the decree provided that Matthew would pay $782.61 per month to Katie. With medical support, the decree stated that Katie would provide a health benefit plan for the children. The decree also provided that the parties would evenly split any uncovered medical expenses.

Following entry of the decree, Katie and the children remained in Council Bluffs. Although their coparenting relationship was not perfect, Matthew and Katie maintained an amicable relationship for the first few years after their divorce. Katie testified at the modification hearing that she and Matthew were "very close" and "told each other everything." In March 2020, Matthew moved to a home in Omaha,

Nebraska to live with his mother.[1] This resulted in Matthew being only twenty minutes away from Katie and the children. Due to Matthew being closer, Katie often afforded him more parenting time with the children than what was required under the decree. In January 2021, Katie even asked if the children could temporarily live with Matthew while she was in between housing. The kids lived with Matthew until June 2021. However, Matthew and Katie's healthy coparenting relationship fell apart in 2023.

On August 1, 2023, Matthew filed a petition to modify the physical care and child support provisions of the dissolution decree. In his petition, Matthew asserted that a substantial and material change in circumstances had occurred because Katie's "living environment" was allegedly no longer stable.[2] Twenty-one days later, on August 22, Katie was arrested on an outstanding warrant for possession of drug paraphernalia while she was driving to an outlet mall to go back-to-school shopping for the children.[3] According to her:

> I was actually at the end of a cul-de-sac. I got off at the wrong exit for the outlet mall and got on a frontage road and there was like a cul-de-sac at the end of it, and I stopped there to look up directions, and, to be honest, play Pokemon, because me and my son are constantly playing Pokemon. And so I looked up directions and I was sitting there playing Pokemon and then that's when a police officer— well, sheriff came up to my car because they ran my tags and they said that I had an active warrant.

---

[1] At the time of the modification hearing, Matthew still lived in Omaha with his mother.

[2] In Matthew's initial petition, he did not clarify whether he was seeking physical care or joint physical care. Matthew later amended his petition to include additional assertions of a substantial change in circumstances. In his amended petition, he also requested that he be granted physical care of the children. However, at the modification hearing, Matthew expressly asked for joint physical care.

[3] Katie testified that this charge stemmed from an incident that occurred nearly eleven years ago.

As the police officer was speaking with Katie about her outstanding warrant, he noticed an odor of marijuana emanating from her vehicle. Katie admitted that she had marijuana in the vehicle and offered to surrender it to the officer. The officer then informed her she was under arrest and ordered her to place her hands on the steering wheel. Katie testified that after she was arrested and placed in the officer's police vehicle, the officer "found one of my Adderall [pills] outside of the pill bottle."[4]

Katie was subsequently charged with possession of a controlled substance (Adderall) and possession of marijuana. As a result of her arrest, she spent nearly three days in jail in Sarpy County, Nebraska. However, the possession of a controlled substance and possession of marijuana charges were ultimately dismissed.[5] Katie pled guilty to the drug paraphernalia charge out of Washington County, Nebraska and paid a $100 fine.

After discovering Katie was arrested, Matthew filed an ex parte motion requesting that he be granted temporary sole legal custody and physical care of the children. The district court entered an order granting Matthew's requests on August 24. However, the district court set aside the ex parte order on October 23 and provided that the legal custody and physical care provisions of the decree remained in effect.

On March 13, 2024, trial on Matthew's petition for modification occurred. During the trial, the court heard extensive testimony from Matthew and Katie.

---

[4] The arrest occurred in Nebraska.
[5] At the modification hearing, Katie introduced a list of her valid prescriptions into evidence, which included a prescription for Adderall.

Matthew testified that he "always" planned to move back to the Omaha area to be closer to his children. Matthew also explained that he believed his move to Omaha constituted a substantial change in circumstances sufficient to modify the physical care provisions of the decree. As he put it:

> I live twenty minutes away from my kids now. I don't live an hour and a half away. Logistically it wasn't feasible for me to have them, you know, an hour and a half away. Like I said, I live twenty minutes away. There is no reason why I cannot have equal parenting time.

During the hearing, Matthew also raised concerns about the instability of Katie's housing since the entry of the original decree. Following the entry of the decree, Katie and the children moved in with her parents. But this only lasted until January 2021 because Katie and her mother would constantly "bicker back and forth." As Katie's father testified, "[Katie] and her mother can't live together, plain and simple." Katie decided to move out of her parents' house after she and her mother got into a physical altercation in front of the children.

Katie recounted that she subsequently moved into a one-bedroom apartment with Garrett Koepke—her boyfriend at the time. But since she did not believe a one-bedroom apartment was appropriate for two children, she asked Matthew if the children could temporarily live with him until she found more suitable housing. As she explained in her testimony:

> So I called Matt and I asked him if it would be possible, if I did this temporarily until I found my own place, if he would step up and watch the kids more so I wouldn't have to take them to—I mean, that wouldn't be ideal for any child to hang out on couches in a one-bedroom apartment.
> And so he agreed as long as I would, you know, take them to school because his mother didn't want to put the cost out to take them to school every day. Obviously that would be a lot of gas and a lot of time. So long as I agreed to doing that, then we kind of just flip-flopped schedules until I found my own permanent residence.

Despite the temporary nature of Katie's living arrangement with Koepke, things did not go smoothly. Katie testified that she and Koepke "had a very tumultuous relationship during that time." Matthew testified that while Katie lived with Koepke, "she called me one morning and asked me to come help her because Garrett had been drinking all night and he was being physically abusive, and then also there was some blood on the wall." Katie denied calling Matthew to ask him to protect her from Koepke. But she admitted she and Koepke "were violent with each other." Of note, Katie stated she and Koepke are no longer in a relationship.

Katie testified that, in June 2021, she and the children moved into a two-bedroom apartment in Council Bluffs. According to her, the apartment

> was like 1100 square foot where the boys had their own bathroom, I had my own bathroom. They had their room. It was really nice because the bunk beds fit in there perfectly. It was on the first floor. It was a walk-in so we could go outside and hangout on the deck. It was up in the hills so we got to see animals and stuff all the time. Had a perfect view of, like, downtown Omaha so when the fireworks happened. It was a really, really nice place. We loved it.

But Katie and the children lived in this apartment for only six months. In January 2022, Katie decided to move into her grandfather's house. According to her, this was so she could support her grandfather and ensure that he could remain living in his home. During this timeframe, her grandfather had recently become a widower and been diagnosed with cancer. Katie and the children currently live in her grandfather's home. And she testified that she will "probably be there the rest of my life."

However, housing instability was far from the only concern Matthew had with Katie. He also expressed concern about Katie's behavior and her use of

alcohol. He testified that he believes Katie and her friends drink excessively in front of the children. He also testified that he had suspicions Katie was under the influence of alcohol during custody exchanges. Additionally, he recounted an incident at a tee-ball game for B.M. that occurred two to three years prior to the modification hearing. During the game, Katie and several parents were drinking vodka out of a water bottle. Katie had to warn W.M. not to drink out of the water bottle.

In her testimony, Katie admitted to drinking socially.[6] However, she denied drinking excessively in front of the children. In describing her relationship with alcohol, she stated:

> I enjoy it when I drink it. I've been known, you know, when I don't have my kids to go to the bar and have some drinks with my friends and play darts. At home it's not really a thing very much until—if I do have anything, it would be after the kids go to bed and it's nothing that I would ever consider it to be a huge part of my life. My grandfather's a recovering alcoholic. My dad was hit by a drunk driver. My mother is a recovering alcoholic as well. So it's nothing that would be openly something you do at my house.

Lastly, Matthew expressed concern over the children's recent behavioral issues. According to him, W.M. has "anger issues." He testified that W.M. often walks out of school, gets sent home early from school, and struggles to stay in the classroom. Additionally, he recounted that recently one of B.M.'s teachers told him B.M. had started hanging out with a student who had been "founded for bullying." He added that while the children were briefly under his primary care, he placed the children in therapy. In his view, therapy was very beneficial for the children and helped

---

[6] Katie also testified that she used to frequently smoke marijuana with Matthew. In fact, evidence admitted at the modification hearing suggests Matthew has previously supplied Katie with marijuana.

improve their behavior. Under his care, he noticed the children "being kids, being happy, like a weight was lifted off their shoulders, like they didn't have anxiety." However, when Katie resumed physical care, she unilaterally decided to take the children out of therapy. Matthew believed this had a detrimental effect on the children's behavior.

During her testimony, Katie admitted the children have some behavioral issues. She testified that she had previously enrolled B.M. in therapy in 2019. She stated B.M. was in therapy "for quite a little bit until Matt objected to it and then I had to take him out of it." She also conceded W.M.'s behavioral problems are more severe. She described W.M. as a "flight risk" while he's at school. She added:

> He, like, leaves class the second he gets mad. He gets frustrated and throws things, like, he won't take direction. At one point they said that he put his hands down a little girl's pants while Matt had him in custody, so I'm just getting the reports after the fact. Just a lot of really, really strong language, screaming, hollering, not wanting to focus, just some very scary things that you wouldn't want your kid doing in school.

After being approached by a staff member at W.M.'s school, Katie decided to seek medication to help address his behavior—a decision Matthew strongly disagreed with. However, she indicated in her testimony that medication was helping to improve W.M.'s behavior at school.[7] She also claimed to notice a significant change in the children's behavior after the ex parte order was set aside and they returned from Matthew's care. According to her, B.M. gained thirty pounds and

---

[7] Katie also testified that she has concerns that Matthew is not giving W.M. his medication when he has the children.

was sad, depressed, and scared. She added that W.M. "was coming back and just saying, like, racial slurs, he was cussing, he was, like, acting crazy."

Following the hearing, the district court issued its ruling on Matthew's petition. The court denied Matthew's request for joint physical care, concluding that he had not shown a substantial change in circumstances had occurred. However, the court modified the child support provisions of the decree. The court found a modification of child support was appropriate "to reflect the parties' current financial situation." Ultimately, the district court raised Matthew's support obligation to $1174.99.

This appeal followed.

## II. Standard of Review

"Modification of dissolution decree actions are tried in equity and review is thus de novo." *In re Marriage of Trickey*, 589 N.W.2d 753, 756 (Iowa Ct. App. 1998). "We have a duty to examine the entire record and adjudicate anew rights on the issues properly presented." *In re Marriage of Steenhoek*, 305 N.W.2d 448, 452 (Iowa 1981). "Though we make our own findings of fact, we give weight to the district court's findings," especially those concerning the credibility of witnesses. *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016).

## III. Discussion

### A. Joint Physical Care

Before we begin to grapple with Matthew's arguments on appeal, we believe it is necessary to discuss the differences between physical care and joint physical care because they come with different analyses in the modification context. "'Physical care' means the right and responsibility to maintain a home for the minor

child and provide for the routine care of the child." *In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007) (citation omitted). As we have explained, "[t]he parent awarded physical care maintains the primary residence and has the right to determine the myriad of details associated with routine living, including such things as what clothes the children wear, when they go to bed, with whom they associate or date, etc." *In re Marriage of Eggeling*, No. 18-0234, 2019 WL 478818, at *2 (Iowa Ct. App. Feb. 6, 2019) (citation omitted).

Conversely, joint physical care means:

[A]n award of physical care of a minor child to both joint legal custodial parents under which both parents have rights and responsibilities toward the child including, but not limited to, shared parenting time with the child, maintaining homes for the child, providing routine care for the child and under which neither parent has physical care rights superior to those of the other parent.

*In re Marriage of Swenka*, 576 N.W.2d 615, 616 (Iowa Ct. App. 1998) (alteration in original) (citation omitted). "[J]oint physical care anticipates that parents will have equal, or roughly equal, residential time with the child." *Hynick*, 727 N.W.2d at 579.

In a modification action, when a parent is requesting physical care of a child, they must show there has been "a substantial change in circumstances since the time of the decree or the time of a modification of the decree, not contemplated by the court when the decree was entered, which is more or less permanent, and relates to the welfare of the children." *In re Marriage of Reicks*, No. 07-1163, 2008 WL 4725252, at *1 (Iowa Ct. App. Oct. 29, 2008). Additionally, a parent must also show they have a superior ability to minister to the needs of the children. *Melchiori*

*v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002). We have described the required showings as a "heavy burden" for the petitioning parent. *Id*.

However, "[w]hen, as here, a parent is requesting a change from the other parent's physical care to their joint physical care, the requesting parent must show (1) a substantial change in circumstances occurred that necessitates the change and (2) joint physical care is in the child's best interests." *In re Marriage of Rigdon*, No. 22-1147, 2023 WL 4530133, at *3 (Iowa Ct. App. July 13, 2023) (citation omitted). A parent petitioning for a modification to joint physical care need not show a superior ability to minister to the needs of the children. *In re Marriage of Terrones*, No. 20-0538, 2020 WL 7021557, at *2 (Iowa Ct. App. Nov. 30, 2020).

From a reading of the district court's ruling in this case, it is evident the court analyzed Matthew's request for joint physical care under the primary physical care analysis.[8] With the proper analysis for a request for joint physical care in mind, we analyze separately whether Matthew established that a substantial change in circumstances occurred and whether joint physical care is in the children's best interests.

*1. Substantial Change in Circumstances*

On appeal, Matthew contends he presented sufficient evidence of numerous grounds to conclude that a substantial change in circumstances occurred. We choose to take his arguments on this issue slightly out of order. We begin with his claim that Katie's housing instability since the entry of the decree amounts to a substantial change in circumstances. It is true that a parent's housing

---

[8] Matthew's brief also conflates the modification analyses for physical care and joint physical care.

instability can amount to a substantial change in circumstances sufficient to trigger a modification. *See Johnson v. Steele*, No. 24-1149, 2025 WL 1074828, at *3 (Iowa Ct. App. Apr. 9, 2025) (concluding a substantial change in circumstances had occurred due, in part, to a mother's housing instability).

We acknowledge that Katie has not been the model for housing stability since the decree was entered. However, we find it significant that she has more recently found housing stability by moving into her ill grandfather's house. At the time of the hearing, Katie and the children had lived in her grandfather's house for nearly two years. By all accounts, the grandfather's house is perfectly suitable housing. And Katie testified at the modification hearing she would likely live in her grandfather's house for the rest of her life. Thus, we cannot conclude that her various moves over the years amount to a substantial change in circumstances. *See In re Marriage of Rickels*, No. 12-1995, 2013 WL 3458173, at *3 (Iowa Ct. App. July 10, 2013) ("We find the several-year-old moves, albeit not without an effect on the children, insufficient to constitute a substantial change in circumstances . . . .").

In his brief, Matthew also suggests that Katie's alcohol use has led to poor decisions and her placing the children in dangerous environments. He contends this amounts to a substantial change in circumstances. A parent's substance use and criminal activity has been found sufficient to warrant a modification. *In re Marriage of LeGrand*, 495 N.W.2d 118, 120 (Iowa Ct. App. 1992) ("We believe [a father's] serious criminal record and alcohol abuse since the original dissolution decree constitute a substantial change in circumstances."). Like the district court, we have concerns with Katie's history of alcohol use, her admission to previously

smoking marijuana in the not-so-distant past, and her 2023 arrest for possession of marijuana.

However, we are mindful that we must "exercise care in 'judging a parent based on activities which take place during a particular time frame. Instead, a better picture of a parent can be found by viewing the total circumstances, and putting isolated events into perspective.'" *Buschbom v. French*, No. 07-1036, 2008 WL 680404, at *3 (Iowa Ct. App. Mar. 14, 2008) (cleaned up). At the modification hearing, Katie testified that she generally does not drink in front of the children and never drinks to excess while caring for them. We also note Katie received a substance-use evaluation during the course of this case, which expressed no concerns with her use of alcohol. As for her use of marijuana, Katie testified that she has not smoked marijuana since August 2023.[9] And we note that the criminal charges from her August 2023 arrest were dismissed. Put simply, we concur with the district court's assessment that "there is no concrete evidence that Katie's use of [substances] . . . has ever placed the children in danger." Thus, we cannot conclude that Matthew established a substantial change in circumstances on this ground. *See id*. (noting that "sparing substance [use] that does not endanger the child does not" constitute a substantial change in circumstances).

Next, Matthew argues that the children's behavioral issues constitute a substantial change in circumstances. We have previously recognized that an escalation in a child's behavioral issues can constitute a substantial change in

---

[9] We also struggle to find substantial change in circumstances based on Katie's use of marijuana because there is evidence in the record that strongly suggests Matthew also uses marijuana.

circumstances. *See In re Marriage of Karas*, No. 20-1424, 2021 WL 2708994, at *3 (Iowa Ct. App. June 30, 2021) (concluding that a child's behavioral problems since the entry of the original decree constituted a substantial change in circumstances). We believe Matthew has a stronger argument on this point but still conclude he has not established a substantial change in circumstances.

The evidence shows that the children—especially W.M.—have several behavioral issues. As Katie admitted during her testimony, W.M. is a "flight risk" at school. He often wanders off from his classroom and cannot focus on his schoolwork. As for B.M., Katie testified that at times he shows signs of depression and recently gained a significant amount of weight for a child his age. These behavioral issues are troubling. Perhaps even more troubling is the fact that Matthew and Katie cannot see eye-to-eye on how to deal with these issues. Matthew is against medication for the children and a strong advocate for therapy. Katie, on the other hand, has explored prescription medication to help address W.M.'s behavior. And while not against therapy, Katie clearly does not agree with Matthew's suggestions of where to take the children for therapy.

Matthew expects a finding that, because the children have concerning behavioral issues, those issues are attributable to residing with Katie and would be ameliorated if a change of physical care occurred. However, that conclusion is not supported by evidence in the record. The reality is that sometimes children suffer behavioral issues even in the best of familial circumstances and through no fault of anyone. No evidence—expert or otherwise—was presented that connected the children's behavioral concerns with either parties' conduct or parenting.

Moreover, we conclude the children's recent behavioral issues do not amount to a substantial change in circumstances for another reason—there is a paucity of evidence suggesting the children's behavioral issues are a permanent change. *See In re Marriage of Pals*, 714 N.W.2d 644, 646 (Iowa 2006) (noting that to constitute a substantial change in circumstances the change must be "more or less permanent or continuous, not temporary" (citation omitted)). The evidence of when the children's behavioral issues started is, at best, unclear and imprecise. Moreover, we note that neither child currently has an official diagnosis for any sort of mental health disorder. And while we acknowledge that the children's recent behavioral issues are troubling, Matthew presented no evidence suggesting these issues were a permanent change. *See Hardgraves v. Goulette*, No. 23-0818, 2024 WL 960944, at *2 (Iowa Ct. App. Mar. 6, 2024) (concluding a father did not establish a substantial change in circumstances because he failed to show that his daughter's behavioral issues were "more or less permanent").

Lastly, Matthew argues that his move to Omaha—placing him twenty minutes away from the children—constitutes a substantial change in circumstances. In finding that his move did not constitute a substantial change in circumstances, the district court noted that Matthew testified that he "always" intended to move back to the Omaha area to be closer to his children. Consequently, the district court was "unable to find that Matthew's move from Stanton to the Omaha area was a factor that was not contemplated at the time of the decree." But we are not convinced of the district court's reasoning.

A substantial change in circumstances must be a change in circumstances that was not contemplated *by the decretal court* at the time of entry of the original

decree. *See In re Marriage of Ginger*, No. 13-1908, 2014 WL 5478145, at *2 (explaining "a substantial change in circumstances" for purposes of modifying a dissolution decree is "one which was not contemplated by the original decretal court"). Matthew's self-serving testimony that he "always" intended to move back to the Omaha area does not establish that the district court contemplated such a move at the time of entry of the original decree. And because the decree in this case was a stipulated decree, there is no evidence to establish whether the district court contemplated Matthew's intent to move.

But that still leaves the close question of whether Matthew's move to Omaha constituted a substantial change in circumstances. We have previously found that a noncustodial parent's move from hundreds of miles away to be closer to their children is sufficient to find a substantial change in circumstances. *See Rigdon*, 2023 WL 4530133, at *3 (finding a mother's move from Georgia back to Iowa to be closer to her child constituted a substantial change in circumstances). But we have also previously held that a noncustodial parent's move from forty miles away to within minutes of the child's home did not constitute a substantial change in circumstances. *See Heusinkveld v. Schlecht*, No. 19-1132, 2020 WL 1049534, at *4 (Iowa Ct. App. Mar. 4, 2020) (concluding such a move by the noncustodial parent was a "minor change in location" and did not constitute a substantial change in circumstances).

Ultimately, we need not resolve this thorny issue because, as we explain below, we conclude joint physical care is not in the children's best interests.

*2. Best Interests*

In determining the best interests of children, we can consider the factors outlined in Iowa Code section 598.41(3) (2024). *In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007). Whether joint physical care is appropriate typically will turn on "four key considerations: (1) stability and continuity of caregiving; (2) the ability of the [parents] to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) the degree to which parents are in general agreement about their approach to daily matters." *In re Marriage of Geary*, No. 10-1964, 2011 WL 2112479, at *3 (Iowa Ct. App. May 25, 2011) (alteration in original) (summarizing factors established in *Hansen*). In conducting this analysis, "[t]he ultimate objective . . . is to place the child[ren] in the environment most likely to bring [them] to healthy mental, physical, and social maturity. *McKee v. Dicus*, 785 N.W.2d 733, 737 (Iowa Ct. App. 2010).

Starting with the first *Hansen* factor, we note the record is devoid of any evidence giving insight as to how the parents divided care giving responsibilities prior to dissolution. As a result of being granted physical care by the stipulated decree, Katie has served as the primary caregiver of the children for the past several years. However, the evidence shows Matthew often received visitation above and beyond what was required under the terms of the stipulated decree. Further, there were at least two time periods during this case where Matthew took on the responsibilities of being the primary giver. We find that both parents are suitable caregivers. However, the purpose of the first factor is to "avoid disruption to the children's lives." *In re Marriage of Harper*, No. 22-0041, 2023 WL 4105536, at *4 (Iowa Ct. App. Jan. 25, 2023). We are especially mindful of this principle

given the children's recent behavioral issues. With these behavioral issues, we believe the children need stability now more than ever. Thus, we find that this factor ever so slightly favors continuing physical care with Katie though not dispositively.

Moving on to the second and third *Hansen* factors, we note that the parties once had a healthy coparenting relationship and communicated often. Katie testified that she and Matthew were "very close" and "told each other everything." We believe their closeness was exemplified by the fact that Katie often afforded Matthew greater visitation with the children than what was called for under the stipulated decree. However, Katie and Matthew's divergent views on how best to deal with the children's recent behavioral issues, as well as the modification action itself, have driven a wedge in their relationship. Katie testified that Matthew is currently not allowed in her home. And Katie stated she does not call Matthew anymore because he will not answer her calls. We believe these factors weigh against joint physical care.

Relatedly, as to the fourth *Hansen* factor, outside of the disagreement about what medical intervention is necessary to address the children's behaviors, we note there is very little evidence concerning whether the parents agree on their respective approaches to routine daily matters.

In balancing the aforementioned factors, we conclude joint physical care is not in the children's best interests. Accordingly, we affirm the district court's denial of Matthew's request to modify the decree to provide for joint physical care of the children.

**B. Modification of Child Support—CSS'S Appeal**

Turning to CSS's appeal, it argues the district court's modification of the child support provisions of the decree are void because it was never given notice of the modification action nor an opportunity to be heard. CSS claims that because it was providing support services prior to the filing of the modification action, it was a party to the original decree and should have been given notice of the modification action and an opportunity to be heard. Thus, because it did not receive notice and did not participate in the modification action (or otherwise waive), it argues the district court's modifications to the child support provisions of the decree are void. We agree.

Iowa Code section 598.21C(3) provides:

Unless otherwise provided pursuant to 28 U.S.C. § 1738B, a modification of a support order entered under chapter 234, 252A, 252C, 600B, this chapter, or any other support chapter or proceeding between parties to the order is void unless the modification is approved by the court, after proper notice and opportunity to be heard is given to all parties to the order, and entered as an order of the court. If support payments have been assigned to the department of health and human services pursuant to section 234.39, 239B.6, or 252E.11, or if services are being provided pursuant to chapter 252B, the department is a party to the support order.

As CSS points out, there is evidence in the record that it was providing support services prior to the filing of the modification action. A review of the docket in this case reveals CSS filed two documents of notice that it was providing "services" and "enforcement services" in April 2020. Yet it was never provided with notice of the modification action and did not participate in the modification proceedings. Thus, pursuant to section 598.21C(3), we conclude the district court's modifications of the child support provisions of the decree are void. *See Seward*

*v. Hane*, No. 15-0119, 2016 WL 902838, at *4 (Iowa Ct. App. Mar. 6, 2016) (concluding modification of the child support provisions of a decree were void because the department was not given notice of the modification action and an opportunity to be heard).

Consequently, we vacate the modification of the child support provisions of the decree and remand for further proceedings following notice to CSS and an opportunity to be heard.

**IV. Conclusion**

In short, we affirm the district court's denial of Matthew's request for joint physical care. However, we conclude the court's modification of the child support provisions of the decree are void because CSS was a party to the original decree and was not given notice and an opportunity to be heard on this issue. Accordingly, we remand to the district court for a hearing on the issue of child support modification. CSS shall be given notice of such hearing and an opportunity to be heard.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**