**IN THE COURT OF APPEALS OF IOWA**

No. 23-0358
Filed January 10, 2024

**IN RE THE MARRIAGE OF KATIE ANN CUMMINGS
AND KENNETH GEORGE CUMMINGS**

**Upon the Petition of
KATIE ANN CUMMINGS, n/k/a KATIE ANN WESTENDORF,**
    Petitioner-Appellee,

**And Concerning
KENNETH GEORGE CUMMINGS,**
    Respondent-Appellant.
_____

    Appeal from the Iowa District Court for Black Hawk County,

Linda M. Fangman, Judge.


    Kenneth Cummings appeals the physical care, child support, and property

divisions of the decree dissolving his marriage to Katie Cummings.  **AFFIRMED.**


    Maria L. Hartman of Sweet & Hartman, P.L.C., Reinbeck, for appellant.

    Elizabeth M. Wayne of Papenheim Law Office, Parkersburg, for appellee.


    Considered by Tabor, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

Kenneth ("Ken") and Katie Cummings separated in the fall of 2021, after fourteen years of marriage. For the next year, they informally shared physical care of their two daughters. At their dissolution trial, Katie wanted joint physical care to continue while Ken wanted it to end. The district court determined the arrangement was unworkable and placed the children in Katie's physical care. On appeal from the court's dissolution decree, Ken now seeks joint physical care of the children, minimizing the communication problems he highlighted at trial. He also challenges the court's handling of Katie's discovery violations, rejection of the stipulated child support guidelines, and division of a daycare bill. We affirm.

## I.      Background Facts and Proceedings

Ken and Katie married in June 2008. Their oldest daughter was born in 2012 and their youngest in 2018. Katie, while self-represented, petitioned to dissolve the marriage in July 2021, though Ken was not served with notice of the petition until September. The parties lived together until early November, when Katie and the children moved out of the marital home in Waterloo. Neither party handled the end of their marriage well.

Soon after moving out, Katie applied for a domestic abuse protective order because she was bombarded by text messages from Ken. The court denied her request after a hearing but cautioned Ken that he needed to "learn how to control" his "verbal accusations, attacks, snideness." Around the same time, a report was made to the Iowa Department of Health and Human Services that Ken had spanked the youngest child "resulting in welts" and physically assaulted Katie in front of the children. The report was not confirmed. Then, Katie reported Ken's

employer to a work-safety authority after seeing a video that Ken took of their oldest child at work with him "running a machine" without safety equipment. During this same time, Ken was texting Katie that she was a deadbeat and a "lying cheater."

Despite these issues, the parties informally agreed to share physical care of the children on an alternating two-day, two-day, three-day schedule. Katie had moved to Cedar Falls, while Ken was living in his hometown of Reinbeck. The children, however, continued to attend school and daycare in Waterloo, which was about a fifteen-minute drive for Katie and thirty minutes for Ken. Katie intended to move back to Waterloo at some point, but Ken had no plans to leave Reinbeck, where he wanted the children to attend school.

The parties attended mediation in January 2022. Katie was still self-represented, but Ken had an attorney. They purportedly reached an agreement resolving all issues. Yet when Ken's attorney drafted the agreement for Katie to sign, she refused and retained an attorney. The district court denied Ken's subsequent motion to enforce the settlement, finding "mutual assent between the parties was not established at the time of the mediation, particularly on the crucial issue of child custody."

As the case progressed to trial, the district court dealt with a few skirmishes between the parties. One concerned Katie's failure to provide Ken with copies of the children's social security and insurance cards. Following a hearing in October, the court noted that while Katie had provided that information to Ken just before the hearing, her efforts were "inadequate and her actions have not been in good faith." Another concerned Katie's failure to respond to Ken's discovery requests.

The court sanctioned her for that conduct by limiting her ability to present evidence at trial and requiring her to pay $500 in attorney fees.[1]

At the trial in mid-December, a different judge modified that sanctions order over Ken's objection:

> If the witness or the exhibit has to do with custody or school or something directly related to the children, then I'm going to allow that information to come in. It is not in any way to suggest that I don't condemn the late filings and the lack of discovery.
>
> However, in an effort to make a decision that's in the best interest of the children, I feel that I need to have all of the information to make that decision; and I will not limit information as it regards the children.

The court then heard testimony from the parties, Katie's mother, and Ken's aunt.

In January 2023, the court entered its dissolution decree, placing the children in the parties' joint legal custody and Katie's physical care with liberal visitation for Ken. Implicitly finding Katie to be the more credible witness, the court concluded joint physical care "is not reasonable long-term for these children" after considering the factors outlined in Iowa Code section 598.41(3) (2021), *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974), and *In re Marriage of Hansen*, 733 N.W.2d 683, 697–99 (Iowa 2007):

> Katie told the court the last two to three months prior to trial communication between her and Ken had been much better, and she was optimistic they can continue to improve their communication over time. Katie's testimony appeared to be optimistic that in spite of her history with Ken, those matters would be set aside and it would be in the best interest of the girls to have continued contact with their

---

[1] The court ruled, in part:
> [Katie] will not be allowed to present witnesses, however, [Katie] will be permitted to testify; [Katie] will not be allowed to present exhibits unless [she] can show the content of the exhibit was equally available to [Ken] prior to trial; any exhibit that contains information that was only available to [Katie] and was not produced in a discovery response shall not be admissible . . . .

father.  Ken's position is contrary to this and was quick to lay all the blame on Katie.  While Ken acknowledges Katie is a good mom and it's important for the girls to have their mother, he testified their communication is not good.  In fact, he repeatedly testified that, while he doesn't have issues communicating with Katie, Katie has issues communicating with him, and while he has no problem making joint decisions, Katie makes decision without consulting him.  He alleges Katie is responsible for his lack of communication and knowledge with the school even though as a parent is perfectly capable of making contact with the school himself, informing them of his correct phone number and contact information as well as signing up for electronic communication with the school.  He also alleges it is Katie's fault he didn't attend conferences because she did not give him enough information about the school conferences.  This is directly contradicted by Exhibit [4]00 which shows on September 30, 2021, Katie did contact him regarding school conferences and, in fact, set the conference when Ken requested it. . . .  The comments made and the attitude displayed by Ken throughout the trial also supports a finding that shared care is not viable in this particular case.

The court found Katie had been the historical primary caregiver and the principal person involved in the children's schooling, medical care, and extracurricular activities.  In making this finding, the court noted Ken did not know the name of the oldest child's teacher, the children's counselor, or their medical provider.  As a result, the court concluded it was in the children's best interests to be placed in Katie's physical care:

Katie has been the primary caregiver for these girls their entire life.  Katie shares an optimistic view that she and Ken are capable of coparenting the girls together, and she acknowledges it is in the best interest of the girls to have contact with Ken.  Ken, on the other hand, has very little positive to say about Katie.  His testimony consisted of cheap shots and snide comments that had nothing to do with the actual issues before the court but does show his attitude and reflects on his inability to support a positive relationship with Katie.

The court then considered the division of assets, which was limited to a 2005 Toyota Sequoia driven by Ken and the household contents that the parties

had already divided.[2]  The court adopted the parties' agreement to award the Sequoia, valued at $7000 with no debt against it, to Ken.  As for the parties' debts, the court found:

> In this particular case the parties have three marital debts: the mortgage on the trailer; the daycare bill to A-to-Z Daycare and the Kia Sorento loan.  The parties agreed the mortgage should be divided in half, as that was on a trailer purchased during the marriage.  Katie further agreed she would be responsible for the Kia Sorento loan, as the vehicle had been repossessed.  The daycare debt is a debt incurred during the marriage for the benefit of the parties' children.

Although the parties had stipulated at the start of the trial that Katie would be responsible for the $7970 daycare debt, the court divided that debt and the mortgage debt equally between the parties.  Moving on to child support, the court used the parties' stipulated gross annual incomes—$45,000 for Katie and $57,200 for Ken—but ruled Katie should receive a credit for daycare expenses, while Ken should receive one for extraordinary visitation.

Ken moved to amend and expand the court's findings, first asking the court to make Katie solely responsible for the daycare debt like the parties had stipulated.  The court denied that request, finding it was equitable to make the parties jointly responsible for that debt since Ken was awarded the only asset of the marriage.  Ken also asked the court to reconsider its decision to place the children in Katie's physical care, arguing the court should have given more weight to Katie's domestic violence against him, her pretrial discovery violations, and his part in caring for the children during the marriage and after.  The court said that it

---

[2] The court denied Ken's request for a $2500 payment from Katie to equalize the division of the household contents, finding they had been fairly divided.

did consider Ken's testimony about domestic abuse but found those instances were limited, situational, and stress induced. As for the discovery violations, the court ruled that while it was aware of those issues, they did not

> in any way deter [Ken] from being responsible for knowing who his children's teachers are, who their doctor is, what their medical conditions are. [Ken] is their biological father who lived with them up until 2021. The children are old enough to communicate. Paternity is not at issue, and he always had equal access to the children's information and records just like [Katie] did. . . . There is no reason why [Ken] on his own as the biological father on the birth certificate could not go himself to the Black Hawk County Courthouse to get a copy of the birth certificate if he so needed it. The same pertains to the Social Security cards for the children.
> . . . . Unfortunately, the post-trial motion continues [Ken's] behavior of refusing to accept any responsibility to parent his children when it comes to school, medical appointments, or counseling. He instead continues his desire to sit back and expects [Katie] to provide him information and then blame her if she does not.

The court summarily denied the other issues raised in the motion, including its decision to give Katie a child care credit in calculating child support.

Ken appeals, contending the trial court erred in: (1) "overruling the order imposing sanctions on Katie and failing to consider Katie's conduct in the discovery process when assessing her credibility," (2) not placing the children in the parties' joint physical care or, in the alternative, in his physical care, and (3) not following the parties' stipulation on the daycare debt and child support calculations.

II.     **Standard of Review**

We review marriage dissolution cases de novo. *See In re Marriage of Hynick*, 727 N.W.2d 575, 577 (Iowa 2007). While we give weight to the findings of the district court, we are not bound by them. Iowa R. App. P. 6.904(3)(g). We do, however, "give considerable deference to the district court's credibility determinations because the court has a firsthand opportunity to hear the evidence

and view the witnesses." *In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (citation omitted).

## III.   Analysis

*Sanctions ruling.*  Ken objects to the trial court "overruling" the December 9, 2022 sanctions order and allowing Katie to present evidence.  He argues that he was "at a substantial disadvantage at trial" without Katie's discovery responses because the court "relied on the fact that Ken didn't have information pertaining to the children, which was specifically requested in [d]iscovery."  That information included the name of the children's new counselor and their medical provider.  He also contends the trial court did not properly consider Katie's refusal to answer his discovery requests in its credibility findings.[3]

We first note the sanctions order was only modified, not overruled.  Ken did not object to any of Katie's exhibits,[4] which were equally available to him before trial.  And the only objection he made during Katie's testimony was when she gave the name of the oldest child's medical provider for her attention deficit hyperactivity disorder, which caused the court to ask: "[A]re you telling me that the child's father doesn't know she was diagnosed at five and is on medicine and sees a provider?"  Ken's attorney responded, "Your Honor, we're aware of that."

Moreover, the trial court determined that "in an effort to make a decision that's in the best interest of the children, I feel that I need to have all of the

---

[3] The record doesn't support this claim.  As set out above, the trial court was aware of the discovery issues and rejected Ken's claims that he could not access the children's information on his own.

[4] Those exhibits consisted of text messages between the parties and the oldest child's school records.

information to make that decision; and I will not limit information as it regards the children." This follows the principle that "[i]n child custody cases, the first and governing consideration of the courts is the best interests of the child." Iowa R. App. 6.904(3)(o); Iowa Code § 598.41. The court's reasons for modifying the order made sense, and we are not persuaded Ken was unfairly hamstrung in presenting his case.

*Physical care.* Ken challenges the finding that Katie was the primary caregiver, noting that he took on more responsibility for the children as they got older. He argues the court should have ordered joint physical care, "which is consistent to the custodial arrangement the parties had been operating under for the past year." This stance is contrary to his position at trial, during which he testified joint physical care was unworkable because Katie chose not to communicate or co-parent with him. In the alternative, Ken contends the children should have been placed in his physical care in part because he is more stable and financially secure than Katie, lives in a higher-ranked school district, and is a better communicator.

We have reviewed the record and defer to the trial court's credibility determinations. The evidence supports the trial court's detailed findings—set out earlier in this opinion—that joint physical care was not in the children's best interests and placement in Katie's physical care was. We adopt those findings as our own without getting into each of Ken's complaints about Katie, as it would add little to our jurisprudence or the parties' relationship moving forward. *See In re Marriage of Fox*, 559 N.W.2d 26, 29 (Iowa 1997) ("Further detail on that score would unduly lengthen this opinion without adding appreciably to our

jurisprudence."); *see also In re Marriage of Rivas*, No. 99-29, 2000 WL 206571, at *2 (Iowa Ct. App. Feb. 23, 2000) (adopting the trial court's "well-articulated findings" that "echo our own independent conclusions").

*Stipulation.* Ken next objects to the court failing to follow the parties' agreement to assign the entire daycare debt to Katie. But the court correctly stated its duty was to determine an equitable division of property. *See* Iowa Code § 598.21(1) ("Upon every judgment of annulment, dissolution, or separate maintenance, the court shall divide the property of the parties and transfer the title of the property accordingly . . . ."); *In re Marriage of Sullins*, 715 N.W.2d 242, 251 (2006) (noting "the allocation of marital debts inheres in the property division" (citation omitted)).

Katie notes Ken was leaving the marriage with net assets of $1225.41 while she was leaving with zero assets (other than her half of the household contents) and $12,774.59 in debts.[5] We find no inequity in the court's equal division of the daycare debt, which was incurred for the parties' children. *See In re Marriage of Ask*, 551 N.W.2d 643, 646 (Iowa 1996) (noting that in dissolutions, "the court may determine the stipulation regarding property or support is unfair" and reject it).

We also reject Ken's claim that the court erred by deviating from the parties' stipulated child support guidelines to give Katie a credit for her child care expenses. Iowa Court Rule 9.13 requires the court to review a "stipulation of the

---

[5] Ken's vehicle was worth $7000 less $3985 (1/2 daycare bill) less $1789.59 (1/2 trailer debt) = $1225.41. Katie had no vehicle but was responsible for debts—$7000 (repossessed vehicle debt, though she had not yet been informed of any collection efforts) plus $3985 (1/2 daycare bill) plus $1789.59 (1/2 trailer debt) = $12,774.59.

parties establishing child support . . . to determine if the amount stipulated" is "in substantial compliance with the guidelines." As Katie correctly points out, Iowa Court Rule 9.5(2) defines net monthly income as gross monthly income less certain deductions. "Actual child care expenses, as defined in rule 9.11A," is an allowable deduction so long as no variance for those expenses is granted under rule 9.11A. Iowa Ct. R. 9.5(2)(j). Katie pays for the children to attend daycare while she works, so the cost of that expense is an appropriate deduction from her monthly gross income under the child support guidelines. *See* Iowa Ct. R. 9.11A(1) (defining "child care expenses").

*Attorney Fees.* Katie has requested $3000 in appellate attorney fees but has not submitted an affidavit of attorney fees. An award of appellate attorney fees is not a matter of right but rests within this court's discretion. *Berning*, 745 N.W.2d at 94. "We consider the needs of the party making the request, the ability of the other party to pay," the relative merits of the appeal, and whether the party making the request had to defend the district court's decision on appeal. *See id.* Having considered these factors, we decline Katie's request for an award of appellate attorney fees.

We affirm. Costs on appeal are assessed to Ken.

**AFFIRMED.**